**Leslie Hazlett THACKER, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. A14–92–00595–CR.**

Court of Appeals of Texas, Houston (14th Dist.).

Aug. 25, 1994.

Rehearing Overruled Sept. 29, 1994.

Dick DeGuerin, Houston, for appellant.

Dan McCrory, Houston, for appellee.

Before J. CURTISS BROWN, C.J., and SEARS and ELLIS, JJ.

## MAJORITY OPINION

SEARS, Justice.

Appellant entered a plea of not guilty before a jury to the felony offense of Purchase of a Child. TEX. PENAL CODE ANN. § 25.11(a)(2) (Vernon 1989). The jury found her guilty and assessed punishment at a $10,000 fine and confinement for ten years in the Institutional Division of the Texas Department of Criminal Justice, sentence to be probated. Appellant brings twelve points of error, challenging the sufficiency of the evidence, the trial court's denial of a motion to suppress, the trial court's limiting the time for voir dire, the admission of hearsay statements, the admission of extraneous offenses, and the trial court's failure to submit requested jury instructions. We affirm.

Appellant was charged with purchasing five children from her co-defendant, Adamina DeJesus ("Adamina"), who was charged with

selling the children.[1] A person commits the offense of "purchase of a child" if she offers to give, agrees to give, or gives a thing of value to another for acquiring or maintaining the possession of a child for the purpose of adoption. TEX. PENAL CODE ANN. § 25.11(a)(2) (Vernon 1989). Section 25.11 prohibits offering compensation for acquiring a child, unless that compensation is a fee legally paid to a child-placing agency, a fee paid to an attorney or physician for services rendered, or a reimbursement of legal or medical expenses incurred for the benefit of the child. TEX. PENAL CODE ANN. § 25.11(b) (Vernon 1989).

## I. INSUFFICIENT EVIDENCE

■ In her fifth point of error, Appellant contends that the evidence is insufficient to prove that the payments she gave, either directly or indirectly, to Adamina DeJesus were compensation for acquiring or maintaining the possession of a child for the purpose of adoption. The evidence is viewed in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 318, 99 S.Ct. 2781, 2788, 61 L.Ed.2d 560 (1979); *Moreno v. State,* 755 S.W.2d 866, 867 (Tex.Crim.App. 1988). We have thoroughly reviewed the record, and conclude that the evidence is sufficient to support the verdict.

Adamina DeJesus was a prostitute and a drug user, and commonly lived on the streets. By 1989, she had given birth to five children, none of whom she chose to raise. At the age of fifteen, she gave birth to Manuel. He was left to the care of his grandparents, and when they died, eventually to the care of an aunt and uncle. Daniel, her second child, was given to a friend. Her third child, Adamina, was given to a second cousin, Juanita Medrano, when the child was four or five months old. Her next two children, Isaac and Meriebel were left to the care of Louise Martinez, a friend of the family, almost immediately after their births. At the time the events of this case, little Adamina was six years old, Meriebel was four, and Isaac two.

In early 1990, Adamina found herself in jail and pregnant once again, this time with twins. Juanita Medrano, who was raising little Adamina, offered to take care of the twins when they were born, and to adopt them and little Adamina. Adamina agreed, and promised her daughter, little Adamina, that she would have a brother or sister to live with her at Juanita's house. Instead of keeping her promises, Adamina contacted Appellant.

Appellant was the sole proprietor of an adoption agency licensed by the State of Texas. She found birth mothers who wanted to give up their children for adoption, and matched the children with adoptive parents. For her services, she was paid a fee by the adoptive parents of $11,000 for a placement, or $2500 for a "hard-to-place" child. Her procedure was for the birth mother to relinquish her parental rights in favor of Appellant, who would then go to court with the adoptive parents and finalize the adoption.

In mid-March of 1990, Appellant met with Adamina. On April 19, 1990, Appellant bonded Adamina out of jail. On April 21, 1990, the twins were born. The next day, Adamina relinquished her parental rights to the twins, and to Isaac, age two, and Meriebel, age four, after which Appellant gave Adamina approximately one hundred dollars in cash. A month later, she signed a relinquishment of her parental rights for little Adamina. Each relinquishment was followed by a series of cash payments from Appellant to Adamina. Appellant noted the payments in her check ledger either with the name of the recipient or the "code number" of Adamina. Appellant kept a "code book" of assigned code numbers which corresponded to various birth mothers. Those numbers would often appear in the "memo" area of Appellant's checks or in her check register. In this case, Adamina was given the code numbers "387" and "395".

1. *See DeJesus v. State,* No. B14–92–00596–CR, 889 S.W.2d 373 (Tex.App.—Houston [14th Dist.] 1994, no pet. h.).

Between April 19, 1990 and May 27, 1990, over ten thousand dollars in payments were made, either directly or indirectly, by Appellant to Adamina. The following table helps to demonstrate the timing of the payments and the relinquishments:

| DATE | ACTIVITY |
| --- | --- |
| (1) 4/19/90 | $650.00 check paid to bail bond company for release of Adamina, |
| (2) 4/22/90 | **Adamina signs relinquishment of parental rights for twins, and for Isaac, 2, and Meriebel, 4.** |
| (3) 4/22/90 | Appellant gives Adamina $100 in cash. |
| (4) 4/23/90 | Appellant cashes a $2500.00 check; check ledger indicates that check was for "Adamina." |
| (5) 4/26/90 | Appellant cashes a $2000.00 check; memo area of the check indicates that check was for code number "387"— the code number for Adamina; check ledger also indicates that check was for code number "387." |
| (6) 4/26/90 | Appellant cashes a $500.00 check; check ledger indicates that check was for code number "387"—Adamina's code number. |
| (7) 5/01/90 | **Appellant obtains temporary custody of Isaac and Meriebel; Court approves adoption of twins by Robersons.** |
| (8) 5/03/90 | Appellant tenders $800.00 check to Raymond Licerio; Licerio testified that check was cashed and all of the money given to Adamina. Licerio testified the checks were made out to him so that he could cash them and give Adamina the money, because Adamina lacked adequate identification to cash checks made payable to her. |
| (9) 5/11/90 | Appellant tenders $400.00 check to Raymond Licerio; Licerio testified that check also was cashed and the money given to Adamina. |
| (10) 5/18/90 | **Adamina signs relinquishment of parental rights for her daughter Adamina.** |
| (11) 5/18/90 | Appellant tenders two $400.00 checks to Raymond Licerio; Licerio testified those checks were cashed and the money given to Adamina; check ledger indicates that checks were for "Adamina DeJesus." |
| (12) 5/19/90 | Appellant cashes a $2500.00 check; check ledger indicates that check was for "Adamina." |
| (13) 5/27/90 | Appellant tenders a check for $500.00 and another check for $116.00 to Raymond Licerio; Licerio testified that money was given to Adamina; check ledger indicates that checks were for "Raymond/Adamina." |

Licerio testified that all the money was given to Adamina pursuant to the directions of Appellant. However, these were not the only payments made. There is evidence

that, in total, Adamina received over $12,-000.00 from Appellant.

The penal code authorizes: (1) fees paid to a child-placing agency which are authorized by law; (2) fees paid to an attorney or physician for services rendered; or (3) reimbursement of legal or medical expenses incurred for the benefit of the child. TEX. PENAL CODE ANN. § 25.11(b) (Vernon 1989). None of the payments of money by Appellant to Adamina were for any of the above *lawful* purposes. Chris Ros–Dukler, the director of licensing for the Texas Department of Human Resources, testified that agencies may provide *services* and *assistance* to birth mothers, so long as that assistance is not "cash up front." She stated that departmental policy forbids agencies to make cash payments to birth mothers, and that the Department "always views child-placing agencies giving cash, lump sum, retroactive payments [to birth mothers] as constituting undue pressure." This construction of Section 25.11 has recently been affirmed by the Texas Supreme Court, which stated:

> Section 25.11 was adopted to deter the potentially coercive effect of payments to expectant mothers at a time when the best interests of the child, and for that matter the mother and father, are most likely to be subordinated by greed or other ulterior motives.... "In fact, the monetary incentive to sell her child may, depending on her financial circumstances, make [the birth mother's] decision less voluntary."

*In re Thacker*, 881 S.W.2d 307, 309 (1994) (quoting *In re Baby M*, 109 N.J. 396, 537 A.2d 1227, 1241–42 (1988)). Thus, the payments provided by Appellant to Adamina were "lump sum, retroactive" cash payments, unauthorized by either the penal code or the Texas Department of Human Services.

Appellant did not deny that she paid Adamina money, and she admitted that she intended for Adamina to receive the money from the checks to Raymond Licerio. Appellant claims that even if there is evidence that she gave Adamina money, the evidence is still insufficient to prove that the money was for the "purchase" of the children. However, we have further testimony which, viewed in the light most favorable to the jury's verdict, tends to show that the payments were for the "purchase" of the children.

Appellant testified about her policy of billing adoptive parents for the "assistance" she gave the birth mothers. The prosecutor asked Appellant: "Isn't it true that your contract [with adoptive parents] says that these items must be paid before you finalize the adoption [and] you don't finalize until you are paid?" Appellant answered: "I have finalized a lot of adoptions that I have never been paid for at all. *I have paid for the babies,* the fees, everything. Everything I have paid for and I don't have the baby" (emphasis added).

Juanita Medrano testified that Adamina got out of jail on April 19th, and was driven to Medrano's house by Appellant. Adamina told Juanita, "there's this crazy old lady, she brought me over here. She thinks I am going to sell my babies. She wants to buy my babies." Adamina then left Juanita's house and went with Appellant to Houston. On April 27th, after the twins were born and some of the relinquishment papers had been signed, Juanita saw Adamina again. This time Adamina was being taken to the hospital for a drug overdose. In the hospital Adamina stated that she wanted to kill herself because she had nothing to live for. Juanita asked her, "Why, what do you mean you don't have anything. You have your kids." Juanita testified that Adamina responded, "No, I sold them to Leslie Thacker."

The jury, as fact finder, was the judge of each witness' credibility and the weight to be given their testimony. *Sharp v. State,* 707 S.W.2d 611, 614 (Tex.Crim.App.1986), cert. denied, 488 U.S. 872, 109 S.Ct. 190, 102 L.Ed.2d 159 (1988). They were free to believe all or any part of any witness' testimony. *Id.* The jury, in this case, chose to believe the State's witnesses. Reviewing the evidence in the light most favorable to the verdict, we hold that there is sufficient evidence to sustain the conviction. Appellant's fifth point of error is overruled.

## II. MOTION TO SUPPRESS

In her first point of error, Appellant contends the trial court erred in overruling her motion to suppress evidence seized by the State during a search of her business/residence. Appellant attacks the affidavit presented in support of the search warrant, contending the warrant: (1) fails to specifically describe the property to be seized, and (2) fails to set forth sufficient facts to establish probable cause that the property constituted evidence of the offense alleged. We will first address Appellant's contention of a lack of probable cause.

### A. Probable Cause

■ Appellant contends that the affidavit supporting the search warrant fails to set forth sufficient facts to establish probable cause. Specifically, she contends (1) the allegation that she made payments to birth mothers does not describe illegal conduct; (2) the theft offense was alleged by means of a confidential informant and double hearsay; and (3) a specific offense was not alleged until after the documents had been seized and examined by the District Attorney's Office.

■ An affidavit in support of a search warrant must indicate that a specific offense has been committed, must specifically describe the property or items that constitute evidence of the offense or evidence that a particular person committed the offense, and must indicate that the property or items to be searched for or seized are located at the place to be searched. TEX.CODE CRIM.PROC. ANN. art. 18.01 (Vernon 1977 & Supp.1994); *State v. Cantu,* 785 S.W.2d 181, 184 (Tex. App.—Houston [14th Dist.] 1990, no pet.). The task of the magistrate evaluating the affidavit is to make a practical, common sense decision whether, given the totality of the circumstances set forth in the affidavit, there is a fair probability that contraband or evidence of a crime will be found in a particular place. *Johnson v. State,* 803 S.W.2d 272, 288 (Tex.Crim.App.1990), *cert. denied,* 501 U.S. 1259, 111 S.Ct. 2914, 115 L.Ed.2d 1078 (1991). *See also Illinois v. Gates,* 462 U.S. 213, 238–39, 103 S.Ct. 2317, 2332–33, 76 L.Ed.2d 527 (1983) (articulating the "totality of the circumstances" standard). In making the determination, the magistrate is not bound by standards such as proof beyond a reasonable doubt or preponderance of the evidence; his sole concern should be probability. *Johnson,* 803 S.W.2d at 288; *Winkles v. State,* 634 S.W.2d 289, 297 (Tex.Crim.App. 1982) (op. on reh'g).

■ Because of the preference of the legislature for utilization of the warrant process by the police, search warrant affidavits are reviewed in a common sense, not a hypertechnical manner. *Janecka v. State,* 739 S.W.2d 813, 823 (Tex.Crim.App.1987); *Griese v. State,* 820 S.W.2d 389, 392 (Tex.App.— Houston [14th Dist.] 1991, pet. ref'd). Although the magistrate is bound by the four corners of the document, he may nonetheless make reasonable inferences from the facts and circumstances contained in the affidavit. *Guerra v. State,* 860 S.W.2d 609, 611 (Tex. App.—Corpus Christi 1993, pet. ref'd) (citing *Bower v. State,* 769 S.W.2d 887, 902 (Tex. Crim.App.), *cert. denied,* 492 U.S. 927, 109 S.Ct. 3266, 106 L.Ed.2d 611 (1989)). A magistrate's determination that an affidavit establishes the existence of probable cause should be given great deference by a reviewing court. *Johnson,* 803 S.W.2d at 289; *Bower,* 769 S.W.2d at 902 (quoting *United States v. Ventresca,* 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965)).

■ The probable cause that is used to obtain a search warrant may be predicated upon hearsay information furnished to the affiant which is shown to be credible or reliable. *Winkles,* 634 S.W.2d at 292 (op. on original submission). Hearsay on hearsay may be used to establish probable cause as long as the underlying circumstances indicate that there is a substantial basis for crediting the hearsay at each level. *Hennessy v. State,* 660 S.W.2d 87, 91 (Tex.Crim.App. 1983).

The evidence Appellant sought to suppress was the product of a search warrant issued on January 29, 1991. The supporting affidavit was attested to by Larry Boucher, an investigator with the Harris County District Attorney's office, and it alleged that Appellant had committed the specific offenses of

Sale and/or Purchase of a Child, Theft, and Tampering with a Government Document. The affidavit attested that Boucher received information from Ann Hartley, an Assistant Attorney General with the Tort Litigation Division of the State Attorney General's Office, and from Lorraine Parker, an Assistant District Attorney with the Harris County District Attorney's Office Special Crimes Division.

In addition, these informants also related information they received from Nanci Gibbons, an employee of the Texas Department of Human Services charged with investigating and evaluating the possible presence of the offenses with which Appellant was ultimately charged,[2] and an adoptive parent, whose credibility was vouched for by an officer of the court. There is certainly a substantial basis for finding that the hearsay contained in the affidavit is credible at all levels.

Ms. Hartley provided Boucher with information she received from Nanci Gibbons, who "inspected numerous documents [at the business of Appellant] which are required by law and by the Minimum Standards for Child–Placing Agencies promulgated by TDHS to be kept by the Child–Placing Agency at their offices." In support of the allegation that Appellant had committed the offense of Sale and/or Purchase of a child the affidavit stated that:

[Hartley] reviewed copies of adoptive files obtained from Leslie Thacker's place of business by Nanci Gibbons ... [and] took the deposition of Ms. Thacker at her place of business.... At that time Leslie Thacker produced numerous records from her files in her office at 2711 Woodhead, Houston, Texas, including the following: A "ledger" containing the cross-reference of a code number with a biological mother's name; "check registers" containing a listing of all checks written by Thacker, including payee, amount, and date; and cancelled checks.

*[Hartley] discovered a pattern in the records of payments of substantial amounts of money to biological mothers at or near the time that the biological mothers executed irrevocable Affidavits of Relinquishment of their newly-born child* [sic] (emphasis added).

Boucher also received information from Lorraine Parker, who interviewed a confidential informant who had adopted a child through Appellant's adoption agency. According to the affidavit, Ms. Parker told Boucher that the witness was "credible and reliable, has no known criminal history, and has been reputably employed in Texas for a number of years." In support of the allegation that Appellant had committed the offenses of Theft and Tampering with a Government Document, the affidavit stated:

The informant told Ms. Parker, who in turn told your affiant, *the amounts that they had been charged by Leslie Thacker for medical treatment* for the biological mother of their adopted child and for the child and the kind of medical treatment that they had been billed for. Your affiant has obtained copies of medical records for the biological mother and child in question and has found that *the records indicate that certain treatment was not rendered;* your affiant has also reviewed the billing records for same and finds that they indicate that an entity other than Leslie Thacker Child Placing Agency has been billed for the treatment (emphasis added).

 Even a cursory reading of this affidavit makes it obvious that Appellant *probably* charged adoptive parents for medical services which were never rendered, which constitutes Theft under Tex. Penal Code Ann. § 31.03 (Vernon 1989), and that she made payments to biological mothers at or near the time they relinquished their parental rights, which constitutes Purchase of a Child under Tex. Penal Code Ann. § 25.11. Contrary to Appellant's assertion, it *is* illegal for a child-placing agency to make payments to a birth mother, as such payments are seen as having a potentially coercive effect. *See In re Thacker,* 881 S.W.2d 307, 309 (1994) (stating that Section 25.11 was adopted to deter such a coercive effect). Therefore, a reasonably prudent and cautious magistrate could draw

2. *See* Tex.Hum Res.Code Ann. §§ 42.042, 42.044 (Vernon 1990).

reasonable inferences from the facts contained in the affidavit, and would be warranted in believing that the alleged offenses were committed and that Appellant committed them. *Lagrone v. State,* 742 S.W.2d 659, 661 (Tex.Crim.App.1987), *cert. denied,* 485 U.S. 937, 108 S.Ct. 1115, 99 L.Ed.2d 276 (1988).

## B. Specificity

█ Appellant also alleges that the affidavit fails to specifically describe the property to be seized. The description in the warrant requests authority to search for and seize: ·

[A]ny and all records and instruments constituting evidence of an offense or constituting evidence tending to show that Leslie Hazlett Thacker has committed the offenses of Sale and/or Purchase of Child [sic], Theft, and Tampering with a Government Document, that may be found therein including, but not limited to all **financial records** for Leslie Thacker individually and as Leslie Thacker Child Placement Agency (to include audits, cancelled checks, check registers, ledger sheets, bank statements; accounts receivable and payable and invoices and records of payments or receipts; any record whatsoever reflecting expenditures to biological mothers, foster parents, medical personnel, or billed to adoptive parents); All **case records** (to include all of the agency's files and information on biological mothers, children, adoptive parents and prospective placements; all information required by law or administrative rule to be kept by a child placing agency, all correspondence, diaries etc. and legal documents); all written policies and procedures; all employment files, applications; all materials regarding training of employees, foster parents, etc; all contracts with biological parents, prospective adoptive parents, foster parents, employees or contractors and medical personnel; all phone bills showing long distance calls made or received; and all other records in whatever form constituting evidence of Sale and/or purchase of a child, theft, or tampering with a government document (emphasis in original).

█ The Fourth Amendment to the United States Constitution requires that things to be seized should be described with particularity, which makes general searches impossible. *Stanford v. Texas,* 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965); *Winkfield v. State,* 792 S.W.2d 727, 731 (Tex.App.—Corpus Christi 1990, pet. ref'd). The items to be seized must be described with sufficient particularity such that the executing officer is not left with any discretion to decide what items may be seized. *Id.* However, the requirements for the particularity of a description of an item may vary according to the nature of the thing to be seized. *Gonzales v. State,* 577 S.W.2d 226 (Tex.Crim. App.), *cert. denied,* 444 U.S. 853, 100 S.Ct. 109, 62 L.Ed.2d 71 (1979). When the circumstances of the crime make an exact description of the instrumentalities of a crime a virtual impossibility, the searching officer can only be expected to describe the generic class of items he wishes to seize. *Ellis v. State,* 714 S.W.2d 465, 471 (Tex.App.—Houston [1st Dist.] 1986, pet. ref'd) (quoting *Spinelli v. United States,* 382 F.2d 871, 886 (8th Cir.1967), *rev'd on other grounds,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969)).

The affidavit supporting the search warrant in this case described three offenses, all of which necessitated proof by resort to a volume of documentary evidence. Considering the nature of the alleged offenses, and the volume of paperwork associated with the running of a state-licensed adoption agency, we find that it would have been impossible for the investigator to describe the records with any greater specificity. In fact, the State's investigator attempted to more specifically identify the critical documents by listing examples after the two generic categories, "financial records" and "case records." These were specific examples of the *types* of documents the State hoped to discover and seize at the business of Appellant. The records of Appellant's adoption agency are *all* inextricably linked to proving the offenses of purchase or sale of a child, theft, and tampering with government documents, as alleged in the affidavit, and we may conclude that *all* of Appellant's financial records and adoption files were likely to contain evidence of Appellant's wrongdoing. The magistrate did not

abuse his wide latitude of discretion in finding that the search warrant described the items to be seized with sufficient specificity. Appellant's first point of error is overruled.

## III. TIME LIMIT ON VOIR DIRE

 In Appellant's second point of error, she contends the trial court erred in limiting the amount of time available for voir dire examination of the jury. She argues that her defense attorney was prevented from questioning a number of jurors regarding the issues of the case, and was therefore unable to intelligently exercise peremptory challenges.

 The control of the voir dire examination is within the sound discretion of the trial court, and the trial court may impose reasonable restrictions on the manner in which the voir dire is conducted. *Ratliff v. State,* 690 S.W.2d 597, 599 (Tex.Crim.App.1985). The judge's discretionary authority extends to imposing reasonable limits on the time allotted for counsel to question the jury. *Caldwell v. State,* 818 S.W.2d 790, 793 (Tex.Crim.App. 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1684, 118 L.Ed.2d 399 (1992). In determining whether the trial court abused its discretion by imposing a time limitation, we must consider a three-prong test:

1. whether the party attempted to prolong the voir dire;
2. whether the questions that the party was not permitted to ask were proper voir dire questions; and
3. whether the party was not permitted to examine prospective jurors who actually served on the jury.

*McCarter v. State,* 837 S.W.2d 117, 119 (Tex. Crim.App.1992); *Ratliff,* 690 S.W.2d at 599, 600. If we find a party unnecessarily prolonged the voir dire, or that the unasked questions were not proper, the trial court's decision to limit voir dire should be affirmed. *See Ganther v. State,* 848 S.W.2d 881, 883 (Tex.App.—Houston [14th Dist.] 1993, pet. ref'd). When an Appellant challenges the trial court's limiting the time allowed for voir dire, we focus on whether Appellant proffered a proper question concerning a proper area of inquiry. *Caldwell,* 818 S.W.2d at 793.

For us to make this determination, it is essential that the record reflect what question or questions the party was prevented from asking, and the trial judge's ruling. *Cockrum v. State,* 758 S.W.2d 577, 584 (Tex. Crim.App.1988), *cert. denied,* 489 U.S. 1072, 109 S.Ct. 1358, 103 L.Ed.2d 825 (1989). *Accord Caldwell,* 818 S.W.2d at 794.

In this case, prior to the start of trial, Appellant tendered to the trial court a list entitled "Defendant's Suggested Voir Dire Questions," consisting of 43 numbered questions, with subparts. The trial court informed the parties that they each had forty-five minutes in which to conduct their voir dire. Appellant's counsel objected that the time limit was unreasonable, to which the trial judge replied: "It's not set in stone. If I think there is some reason that you need more time, I'll give it to you as it is needed." Appellant was actually afforded one hour and nine minutes before the judge informed him that time had expired. At that time, Appellant's counsel objected that the judge was placing an unreasonable limitation on the voir dire, but defense counsel did not proffer specific questions that he was prevented from asking. *Compare Ratliff,* 690 S.W.2d at 599 (following objection to limitation on time, appellant offered a list of fifteen questions he wanted to ask); *Wheatfall v. State,* 746 S.W.2d 8, 10 (Tex.App.—Houston [14th Dist.] 1988, pet. ref'd) (appellant provided the court a list of four questions he was only able to ask a few jurors, and seven questions he was prevented from asking altogether). Appellant's counsel was later given additional time to question veniremembers during the individualized voir dire at the bench. At the end of that colloquy, counsel stated "I filed suggested voir dire questions. I would ask the questions, *at least some of them,* that are contained in the suggested voir dire questions, and I did not have the time to ask, such as the ages of the children that each of the jurors have" (emphasis added). Counsel did not specify which of the other unasked questions he wanted to ask the prospective jurors.

This Court does not have the time nor the duty to peruse the extensive list of suggested questions in order to determine which ones

defense counsel was prevented from asking, if any, and then guess which of those he wanted to ask. We find no error by the trial court.

 We further note that several of the questions included in Appellant's list of suggested questions are not proper voir dire questions, as they are not material to the issues of the case. *See Caldwell*, 818 S.W.2d at 794 (stating a "proper" question is one that seeks a juror's views on an issue applicable to the case). Many questions, such as those regarding the juror's occupation, length of time in present job, spouse's occupation, and prior contacts with the jury system are repetitive of those questions on the juror information card. *See Ratliff*, 690 S.W.2d at 599 (stating that unnecessarily repetitious questions reveal an attempt to prolong voir dire). During his voir dire, defense counsel was warned repeatedly by the trial court that he was wasting time, and asking improper questions. Instead of heeding this warning, counsel continued to ask the same question that the court had just determined was improper, which prompted the judge to warn him again about wasting time. Although he could have moved on to one of the questions he was unable to ask, defense counsel continued along the same line of questioning, and spent additional time answering proper objections by the State. Counsel has the responsibility to appropriately budget his time within the reasonable limits set by the court. *Godine v. State*, 874 S.W.2d 197, 202 (Tex.App.—Houston [14th Dist.] 1994, no pet.h.); *Tobar v. State*, 833 S.W.2d 296, 298 (Tex.App.—Corpus Christi 1992), *rev'd on other grounds*, 850 S.W.2d 182 (Tex.Crim.App.1993). The trial court apparently found defense counsel attempted to unnecessarily prolong the voir dire process. We therefore find no abuse of discretion, and we overrule Appellant's second point of error.

## IV. HEARSAY

 In her third and fourth points of error, Appellant contends the trial court erred in admitting into evidence the testimony of Juanita Medrano that Adamina told her (1) that Appellant wanted to "buy" her babies, and (2) that she had "sold" her twins to Appellant. Appellant claims the statements constituted inadmissible hearsay.

Over objection, the trial court allowed Juanita Medrano to testify that when Adamina arrived at her house on April 19, 1990, she told Juanita: "But there's this crazy old lady, she brought me over here. She thinks I am going to sell my babies. She wants to buy my babies." Juanita also testified, over objection, that when she asked where the twins were, Adamina "started crying and she told me that she had sold them to Leslie [Thacker]."

However, later in Juanita's testimony, all of the following evidence came in by defense counsel's direct questions, or by the State without objection:[3]

[Adamina's defense counsel]: And what did [Adamina] tell you?

A: She told me, she says *I sold [the twins] to Leslie Thacker* and I told her why.

Q: And there's a term *selling* again. Are you sure those are the words you [sic] used?

A: Yes.

　　*　　*　　*　　*　　*　　*

[Prosecutor]: What did Adamina say she wanted or she was trying to get from Leslie Thacker?

A: Money.

Q: How did she tell you that?

A: She said, "*The old B wants to buy my babies.* She has got a lot of money. She can do anything."

　　*　　*　　*　　*　　*　　*

[Prosecutor]: [W]hy did you tell Adamina that she was about to die?

A: Because I knew what she had done but I wanted to make sure that what was done, you know—I wanted to make sure that she knew what she had done, you know.

Q: What she had done in relationship to what?

---

3. All emphasis is added.

A: To *selling the babies to Leslie Thacker*.

Q: Which babies?

A: The twin babies.

 * * * * * *

Q: And what did she tell you about what she had done with the twins?

A: Well, when I went in there and I started talking to her and I asked her, why, why did she want to kill [herself], why, and she said that she didn't want to live any more because now she really didn't have anything. And I says, "Why, what do you mean you don't have anything. You have your kids." And then she started crying and she said, "No, *I sold them to Leslie Thacker.*"

 * * * * * *

[Appellant's defense counsel]: [Y]ou have told this jury that she told you she had nothing to live for, right?

A: Yes.

Q: Because she had given away her babies, all of her babies to Ms. Thacker, correct?

A: No, sir.

Q: *Sold her babies to Ms. Thacker?*

A: The twins.

■ Error in the admission of evidence is cured where the same evidence comes in elsewhere in the testimony without objection. *Johnson v. State,* 803 S.W.2d 272, 290 (Tex.Crim.App.1990), *cert. denied,* 501 U.S. 1259, 111 S.Ct. 2914, 115 L.Ed.2d 1078 (1991) (quoting *Hudson v. State,* 675 S.W.2d 507, 511 (Tex.Crim.App.1984)). Defense counsel must object every time allegedly inadmissible evidence is offered. *Id.* at 291. Error, if any, was waived when Appellant failed to object to the subsequent testimony regarding Adamina's statements about *selling* the babies to Leslie Thacker. Also, Juanita was asked the same question by defense counsel that she now complains is hearsay and inadmissible. We overrule Appellant's third and fourth points of error.

## V. EXTRANEOUS OFFENSES

In points of error six through ten, Appellant contends the trial court erred in admitting evidence of extraneous offenses or bad acts. In point of error eleven, Appellant claims that admission of such extraneous offense evidence harmed Appellant. Specifically, Appellant claims error from the introduction of the following allegations:

(1) Appellant failed to disclose to the adoptive parents that Adamina's twins tested positive for cocaine at birth;

(2) Appellant was involved in civil litigation for improper conduct regarding adoption services;

(3) Appellant failed to disclose to the adoptive parents information about Adamina's history of drug use and criminal activity;

(4) Appellant made payments to other birth mothers; and

(5) Appellant paid a referral fee to attorneys for adoption referrals.

Texas Rule of Criminal Evidence 404(b) prohibits the admission of evidence of other crimes or bad acts committed by the accused to prove the character of the person and that she acted in conformity with that character. TEX.R.CRIM.EVID. 404(b). The gravamen of Rule 404(b) is that a defendant is to be tried only for the crimes alleged in the indictment and not for being a criminal in general. *See Abdnor v. State,* 871 S.W.2d 726, 738 (Tex. Crim.App.1994). To constitute an extraneous offense, the evidence must show a crime or bad act, and that the defendant was connected to it. *Lockhart v. State,* 847 S.W.2d 568, 573 (Tex.Crim.App.1992), *cert. denied,* —— U.S. ——, 114 S.Ct. 146, 126 L.Ed.2d 108 (1993). Less prejudice to the defendant results from the revelation of noncriminal acts than from disclosure of criminal conduct, *Abdnor,* 871 S.W.2d at 738, although we analyze the admission of both according to the same standard of review. *Plante v. State,* 692 S.W.2d 487, 490 n. 3 (Tex.Crim. App.1985).

■ Evidence of other crimes or bad acts is admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *Lockhart,* 847 S.W.2d at 570. It is within the discretion of the trial court to determine whether admission of the

evidence serves some purpose other than character conformity. *Montgomery v. State,* 810 S.W.2d 372, 391 (Tex.Crim.App.1990) (op. on reh'g). Once a defendant invokes Rule 404(b), if the trial court determines that the evidence is relevant only for character conformity, it has no discretion to admit the evidence over a proper objection. *Id.* at 390. On the other hand, if the trial court determines that the evidence is relevant, the defendant must further object that the evidence is unfairly prejudicial, and the trial court must then use the balancing test iterated in Rule 403 to determine whether the danger of unfair prejudice substantially outweighs the probative value of the evidence. TEX.R.CRIM. EVID. 403; *Montgomery,* 810 S.W.2d at 389; *Lockhart,* 847 S.W.2d at 573. Because Rule 403 favors the admission of relevant evidence, the trial court should favor admission in close cases, and it has wide latitude in ruling on the prejudicial nature of evidence. *Montgomery,* 810 S.W.2d at 389–90.

## A. Failure to disclose information about the twins or Adamina's background

 In her sixth point of error, Appellant contends the trial court erred in admitting the extraneous offense evidence that Appellant failed to disclose to the adoptive parents that the twins had tested positive for cocaine at birth. In her eighth point of error, Appellant contends the trial court erred in admitting the extraneous offense evidence that Appellant failed to disclose to prospective adoptive parents Adamina's criminal record, or her history of drug abuse.

The State introduced the testimony of Teressa Roberson, the woman who adopted the twins. Appellant claims the following testimony is objectionable:

[Prosecutor]: This is a portion of medical records which have been introduced as State's Exhibit 30. Regarding the twins, baby boy DeJesus and the neonatal profile, have you ever seen this document before today?

A: Not that I'm aware of.

Q: Baby boy DeJesus, can you please read this line with respect it says prenatal [sic].... And can you read this section here in the comments where it talks about plus for cocaine, positive for cocaine.

\* \* \* \* \* \*

A: I don't know what the first word is but it has a positive sign and circle for cocaine.

Q: And can you please state whether you have seen this signature where it says parent or guardian?

A: It resembles the one we get on her letters, Leslie Thacker's letters.

\* \* \* \* \* \*

Q: Did you receive this from Leslie Thacker when you asked for the babies' medical papers?

A: No.

At that point, Appellant's counsel objected that admission of the testimony was in violation of Rule 404(b) because it was an extraneous matter. The judge overruled the objection. Appellant did not raise an objection under Rule 403.

Appellant testified on cross-examination that she did not recall discussing the cocaine testing results in the neonatal profile with anyone when she took the twins from the hospital, and that the records she received contained no notations about the twins' testing positive for cocaine. She further testified that she was not aware until June, 1990 that Adamina had used drugs, and at that time she informed the Robersons of Adamina's drug use, but thought that she had not used drugs during the pregnancy. Appellant's counsel objected to the general line of questioning as not relevant to the charges in the indictment, and inadmissible under Rule 404(b). The court overruled the objection, but granted a running objection to the remainder of the testimony on the issue. Appellant did not ask the court to conduct a balancing test under Rule 403.

Over an objection that the testimony was "not relevant and in violation of 404 B [sic]," the State offered the rebuttal testimony of Cynthia Thornton, the newborn nursery nurse at the University of Texas Medical Branch in Galveston, Texas. Ms. Thornton stated that she had a 30 minute discussion about the neonatal profile of the DeJesus twins with Appellant prior to discharging the

twins. In particular, she testified that she told Appellant on April 25, 1990 the twins needed follow-up care and needed to be observed for signs of withdrawal from cocaine. She said Appellant took the neonatal records which showed the positive cocaine tests and put them in her purse.

The other evidence that Appellant finds objectionable consisted of testimony to the effect that Appellant was aware prior to attempting to place little Adamina, Meriebel, and Isaac with adoptive parents, that their mother had a history of drug use and criminal convictions; however, she failed to disclose this information to the prospective adoptive parents.

Appellant was buying babies to sell for a profit. Under Rule 404(b), evidence of other acts may be admitted if relevant to a material issue in the case apart from its tendency to prove the character of the defendant. *Montgomery*, 810 S.W.2d at 377; *Linder v. State*, 828 S.W.2d 290, 296 (Tex.App.—Houston [1st Dist.] 1992, pet. ref'd). Evidence which demonstrates the presence of a motive on the part of the accused is admissible if it tends to prove the commission of the offense. *Gosch v. State*, 829 S.W.2d 775, 783 (Tex.Crim.App. 1991), *cert. denied*, —— U.S. ——, 113 S.Ct. 3035, 125 L.Ed.2d 722 (1993). *See also* TEX. R.CRIM.EVID. 404(b); *and Lockhart*, 847 S.W.2d at 570 (stating evidence of a defendant's bad acts may be admitted for the purpose of proving motive). Throughout the trial there was evidence that Appellant charged adoptive parents fees of $11,000 for a healthy Caucasian child, and $2500 for a "hard-to-place" child. Although the term "hard-to-place" was never specifically defined for the jury, there was testimony that children who required medical care over and above that for a normal, healthy newborn could be considered hard-to-place, as could older children, or biracial children. Under the statute which governs adoption services in Texas, a "hard-to-place child" means one who is:

(1) three years of age or older; or who is

(2) difficult to place in an adoptive home because of age, race, color, ethnic background, language, or physical, mental, or emotional handicap; or

(3) a member of a sibling group that should be placed in the same home.

TEX.HUM.RES.CODE ANN. § 47.001 (Vernon 1990). Adamina's children, especially the older three, fit this definition. Moreover, it is common sense that a child testing positive for cocaine at birth, or an older child whose mother was a drug user with a criminal history, would be considered a hard-to-place child. They command a fee of only $2500, because *informed* adoptive parents are unwilling to take on the uncertainties and potential for lifelong problems associated with children born with a cocaine addiction, or those from a mother with a history of drug abuse or criminal activity. Appellant hid the truth to increase her profit; therefore the complained-of testimony was material and relevant.

We hold that evidence of Appellant's failure to inform the adoptive parents of the positive cocaine tests or Adamina's background was not the type of evidence rendered inadmissible by Rule 404(b). Furthermore, the evidence was relevant to show Appellant's motive for buying the children. Appellant's sixth and eighth points of error are overruled.

### B. Involvement in other civil litigation

In her seventh point of error, Appellant contends the trial court erred in admitting evidence that Appellant was involved in civil litigation for improper conduct regarding her adoption agency. During the testimony of Teressa Roberson, the State discussed a contract dispute between the Robersons and Appellant which arose *after* Mrs. Roberson testified on behalf of the State at a civil proceeding regarding the revocation of Appellant's adoption agency license. Appellant objected and reminded the trial court of her Motion in Limine to exclude evidence of the civil proceeding against Appellant's agency. The trial court sustained the objection and told the State it could ask if the witness testified, but could not go into the nature of the testimony. The only testimony elicited by the State immediately after Appellant's objection was the following:

[Prosecutor]: In between having the finalization of the adoption of your twin sons by

Ms. Thacker on September 11, 1990, and the phone call that your husband received in early December of 1990, *did you testify on behalf of the State in legal proceedings against Leslie Thacker?*

A: Yes.

Q: And without going in to [sic] anything about the type of litigation that it was, did that litigation involve the suit that [defense counsel] asked you about over the bill between you and your husband and Leslie Thacker?[4]

 * * * * * *

A: No.

We disagree with Appellant's contention that the above testimony constituted the admission of improper conduct by the agency in violation of Rule 404(b). Nothing in the above testimony in any way suggests that the litigation related to improper conduct by Appellant's adoption agency, and there was no way for the jury to glean that information from the testimony reproduced above. We find no harm. Appellant's seventh point of error is overruled.

### C. Payments to other birth mothers

■ In her ninth point of error, Appellant contends the trial court erred in admitting evidence that Appellant made payments to birth mothers other than Adamina. Specifically, Appellant complains of evidence introduced at three points during the trial:[5]

(1) the State's investigator testified about a check written to Appellant for cash, in which the check ledger entry corresponded with the code number of a birth mother;

(2) the State questioned Appellant's employee if she had ever seen Appellant give

money to a birth mother other than Adamina;

(3) the State questioned Appellant regarding entries in her check register which could have referred to payments to birth mothers.

The State initially sought to introduce into evidence the checks which it considered relevant to the prosecution of Appellant and Adamina. State's Exhibit F consisted of *all* of the individually numbered checks that had been seized when the State executed the search warrant for Appellant's home/office. When the State attempted to introduce one of the checks into evidence, the following exchange occurred:[6]

[Prosecutor]: I show you what has been marked as State's Exhibit F222. Can you identify State's Exhibit F222?

A: Yes, I can.

Q: What is it, please?

A: It is a check that was taken pursuant to a search warrant on the Leslie Thacker Child–Placement Agency.

Ms. Parker: Your Honor, I offer into evidence State's Exhibit [F]222, after tendering to defense counsel for his inspection.

Mr. DeGuerin: *We object to the optional completeness until all the checks that were taken in this series were introduced. We want them all here.*

The Court: That's overruled.

Mr. DeGuerin: *Under the optional completeness rule, we move to introduce exhibit F of the State.*

Ms. Parker: I have no objection, Judge.

Mr. DeGuerin: Let's get it in here.

Ms. Parker: *Your Honor, State's Exhibit F in its entirety consists of 368 pages. I have no objection.*

---

4. During cross examination, defense counsel attempted to attack Ms. Roberson's credibility by showing bias against Appellant, because they were involved in a lawsuit. Defense counsel elicited testimony from Ms. Roberson that the Robersons brought suit against Appellant, seeking a declaratory judgment that they were not liable to her for the twins' medical bills. The suit was initiated because although Appellant told the Robersons they would not be responsible for the twins' medical costs, after Ms. Roberson testified on behalf of the State, Appellant sent the couple a bill for the medical costs, and threatened to sue

them over the bill. It is this suit to which the prosecutor refers in her questioning.

5. Appellant lists a fourth record cite in her brief, but the page number listed has no relevance to the point of error to which it is appended, and we were unable to determine where in the voluminous record Appellant's fourth complaint was located.

6. All emphasis is added.

Mr. DeGuerin: Good, then they are introduced.

The Court: ... It's admitted.

Q: And then I will show you two pages from State's Exhibit F. *State's Exhibit F is what?*

A: *It's all the checks that were taken pursuant to the search warrant.*

Included in the checks that Appellant had just caused to be introduced into evidence were several checks written to other women who were identified as birth mothers.

It is well established in Texas jurisprudence that under the doctrine of invited error, an accused may not invite error and then later complain thereof. *Tucker v. State*, 771 S.W.2d 523, 534 (Tex.Crim.App.1988), *cert. denied*, 492 U.S. 912, 109 S.Ct. 3230, 106 L.Ed.2d 578 (1989); *Linder v. State*, 828 S.W.2d 290, 301 (Tex.App.—Houston [1st Dist.] 1992, pet. ref'd). When the accused in a criminal case offers before the jury the same evidence as that to which she later objects, she is in no position to complain on appeal. *Withers v. State*, 642 S.W.2d 486, 487 (Tex.Crim.App.1982); *Carr v. State*, 726 S.W.2d 608, 610 (Tex.App.—Houston [14th Dist.] 1987, pet. ref'd). *See also Simmons v. State*, 504 S.W.2d 465, 473 (Tex.Crim.App.), *cert. denied*, 419 U.S. 829, 95 S.Ct. 51, 42 L.Ed.2d 54 (1974) (finding no harm in the admission of extraneous offense when appellant's mother first testified about the violation); *Colburn v. State*, 501 S.W.2d 680, 682 (Tex.Crim.App.1973) (holding appellant could not complain of the introduction of an index card into evidence when his counsel first offered the card in evidence). By entering into evidence all of the checks seized by the State's investigator, Appellant introduced the evidence of payments to other birth mothers. Thus, she may not now complain on appeal that the trial court erred in allowing the State to elicit testimony regarding such payments.

■ In addition, the State is entitled to present evidence for rebuttal purposes that tends to refute a defensive theory of the accused. *Flannery v. State*, 676 S.W.2d 369, 370 (Tex.Crim.App.1984) (quoting *Laws v. State*, 549 S.W.2d 738, 741 (Tex.Crim.App. 1977)). Appellant testified that State's Exhibit E, the list of checks written on the check stubs, was "totally unreliable, not correct and not accurate," but admitted that State's Exhibit G, the check register sheet, was reliable and accurate. During her cross-examination of Appellant, the prosecutor attempted to refute the implication by Appellant that the State's evidence was unreliable. The State questioned Appellant as follows:

[Prosecutor]: Now, your testimony is that the check register—that's what you call State's Exhibit G, correct?

A: That is correct, the check register.

Q: And it is your testimony that this document is accurate and State's Exhibit E is not; is that correct?

A: That is correct.

Q: Well, let's compare the two. I am going to start with page E53. Now, it says April 1990 at the top, does it not?

A: Yes.

Q: And that's in your handwriting, correct?

A: All of it is in my handwriting.

\* \* \* \* \* \*

Q: Let's compare those to the next three entries in the pencil on State's Exhibit G. St. Luke's 575825, St. Luke's 56250, Ray Parker 231. So far State's Exhibit G, with the exception of the Denise Guieterez [sic], is tracking exactly State's Exhibit E, correct?

A: It has the same entries.

Q: And the next entries are Caramanna 11000, Stacy Rogas 150, Manden 11000. Do you agree those are the next entries on State's Exhibit E?

[Rule 404(b) and relevancy objections overruled.]

Q: The next three entries: Caramonna 110000, Stacy Rogan 150 and Manders 11000 [sic]. So again this document is tracking State's Exhibit E, correct?

A: What you are reading is; yes.

\* \* \* \* \* \*

Q: The next three will refresh your recollection: Spiller $25, Linda Couteau, Glenda Seibert, $100. Still tracking State's Exhibit E, correct?

A: Yes.

Q: And Linda Couteau out to the side has birth code 385 and Glenda Seibert has birth code 386, correct?

A: I can't read it without looking at the journal, the ledger. I would not know if that is [correct].

The above quoted testimony clearly shows that the State did not offer the evidence of entries in the ledger and register to show that Appellant had made payments to other birth mothers. Instead, the evidence was offered to rebut Appellant's claim that State's Exhibit E, the check ledger containing evidence of payments to Adamina, was inaccurate and unreliable. The State was entitled to cross examine Appellant, and compare the "inaccurate" record with one that Appellant admitted was accurate, in order to rebut Appellant's defensive theory. We hold it was not error for the trial court to allow the evidence to be admitted.

█ Finally, the testimony of payments to other birth mothers was never actually offered into evidence. The State asked the witness the question "[H]as there ever been any other time that you have ever seen Leslie Thacker give money to a birth mother?" and Appellant immediately objected. The trial court did not allow the witness to answer, and instructed the jury that it was to disregard the question and was not to consider the question as any evidence in the case. Generally, a prompt instruction to disregard cures any error in the admission of extraneous acts. *Fuller v. State*, 827 S.W.2d 919, 926 (Tex.Crim.App.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 3035, 125 L.Ed.2d 722 (1993); *Bell v. State*, 768 S.W.2d 790, 797 (Tex.App.—Houston [14th Dist.] 1989, pet. ref'd). We therefore conclude that error, if any, was cured by the trial court's instruction to disregard the question. Appellant's ninth point of error is overruled.

### D. Payments of referral fees to attorneys

In her tenth point of error, Appellant contends the trial court erred in allowing the State to introduce evidence that she had paid a referral fee to attorneys for adoptions.

The evidence of which Appellant complains consists of a portion of the testimony of attorney Robert Hoskins. First, the State asked him if Appellant ever appointed him as guardian ad litem in the adoption cases of women he referred to her. Mr. Hoskins replied that he did not know without consulting his records. Appellant also complains about testimony regarding a letter written by Mr. Hoskins to Appellant in which he offers to serve as guardian ad litem in a case. When asked if he served as ad litem on the case, Mr. Hoskins again replied that he did not know.

█ In the above testimony, we are unable to find any reference to the payment of fees for adoption referrals to Mr. Hoskins or any other attorney. The record cited by Appellant does not support Appellant's point of error. Further, even if we construe the testimony about serving as guardian ad litem on referred adoption cases as establishing the payment of "referral fees," we do not find that a payment of referral fees to an attorney constitutes an extraneous offense as contemplated by Rule 404(b). The State Bar Rules governing the professional conduct of attorneys allows for the payment of fees to a referring or "forwarding" attorney if the client is advised of the participation of both attorneys, and the total fee is not illegal or unconscionable. STATE BAR RULES, Art. 10, § 9 TEXAS DISCIPLINARY RULES OF PROFESSIONAL CONDUCT (1992), *reprinted in* TEX. GOV'T CODE ANN. tit. 2, subtit. G—app. (Vernon Supp.1994). The complained-of testimony does not constitute an admission of an extraneous offense. Appellant's tenth point of error is overruled.

### E. Harm

In her eleventh point of error, Appellant contends that the cumulative effect of the admission of the above extraneous offenses caused her harm. Under Texas Rule of Appellate Procedure 81(b)(2), if this Court finds error in the trial court's proceedings, we shall reverse the judgment unless we determine beyond a reasonable doubt that the error made no contribution to the conviction. TEX.R.APP.P. 81(b)(2). We have found no error by the trial court in admitting the

evidence discussed above. Appellant's eleventh point of error is overruled.

## VI. JURY CHARGE

In her twelfth point of error, Appellant contends the trial court erred in failing to instruct the jury on regulations promulgated by the Texas Department of Human Services. The regulations to which Appellant refers are contained in a Standards Clarification Memorandum issued by the Texas Department of Human Resources Licensing Division [7] ("the Memo"), which states in pertinent part:

Minimum Standards for Child–Placing Agencies (24–Hour Care and Adoption) Standard 3100.1 and Standard 3100.5.[8]

\* \* \* \* \* \*

Licensed child-placing agencies *may provide services* to biological parents and be reimbursed for services rendered pursuant to standard 3100.5. Child-placing agencies may include the following services to expectant mothers:

* reasonable housing costs,

* food,

* clothing,

* utilities,

* personal hygiene products

* transportation directly related to a need for service.

\* \* \* \* \* \*

General maintenance ("allowances"), gifts, long distance telephone services, car repairs, and non-service related transportation are not allowable assistance (emphasis in original).

Appellant presented a total of thirteen requested instructions, all of which were denied by the trial court. The majority of the denied instructions contain language partially derived from the Memo.[9] For example, Defendant's Requested Jury Charge No. 7 states:

You are further instructed that if Leslie Thacker reasonably believed that *the payments of money* she made to Adamina DeJesus, if any, *were for legitimate purposes such as reasonable housing costs, food, utilities, clothing, personal hygiene necessaries, transportation directly relating to a need for services,* or the reimbursement of legal or medical expenses, then Leslie Thacker is not guilty of the crime charged in the indictment. Therefore, if you find from the evidence, or even if you have a reasonable doubt about it, that Leslie Thacker reasonably believed that the payments of money she made to Adamina DeJesus were for legitimate reasons, then you must find her not guilty and so say by your verdict (emphasis added).

In a criminal prosecution, the defendant is entitled to an instruction on every defensive issued raised by the evidence, whether such evidence is strong or weak, unimpeached or contradicted, and regardless of what the trial court may or may not believe about the credibility of the evidence. *Miller v. State,* 815 S.W.2d 582, 585 (Tex. Crim.App.1991) (op. on reh'g). The defendant's testimony alone is sufficient to raise a defensive issue requiring instruction. *Id.,*

---

7. The name of the Texas Department of Human Resources was changed to the Texas Department of Human Services, effective August 26, 1985. Acts 1985, 69th Leg., R.S., ch. 264, § 1, 1985 Tex.Gen.Laws 1236.

8. Standard 3100.1 states:
 1. The child-placing agency shall have written policies stating what services are offered by the agency and who is eligible for these services. A copy of these policies shall be submitted to the Licensing Branch when the signed application is submitted.
 Standard 3100.5 states:
 5. The agency shall have written reimbursement policies for services to biological parents, adoptive applicants, and adoptive parents. Copies of these policies and procedures shall

be available for review by the Licensing Branch.
 The annual income from adoption reimbursement fees shall not exceed the child-placing agency's annual expenditures for providing services to children, children's biological parents, adoptive applicants, and adoptive parents.

9. Appellant does not specify which charges should have been given. However, requested jury charges 1, 2, 3, 5, 7, 8, 10, 11, and 12 all refer in some manner to the DHS regulations and the Memo. Appellant does not complain on appeal about the remainder of the denied charges.

*Hayes v. State,* 728 S.W.2d 804, 807 (Tex. Crim.App.1987) (op. on reh'g). However, when a defendant's requested instruction is contrary to the existing law, there is no error in not submitting it. *Stone v. State,* 703 S.W.2d 652, 655 (Tex.Crim.App.1986); *Simmons v. State,* 741 S.W.2d 595, 597 (Tex. App.—Dallas 1987, pet. ref'd). Further, when a refused instruction is adequately covered by the charge submitted, there is no error in refusing it. *Moody v. State,* 827 S.W.2d 875, 893 (Tex.Crim.App.), *cert. denied,* —— U.S. ——, 113 S.Ct. 119, 121 L.Ed.2d 75 (1992). A defendant is not entitled to have an instruction worded exactly as she requests, as long as the charge correctly states the law, and tracks the statute. *Willis v. State,* 802 S.W.2d 337, 341 (Tex.App.—Dallas 1990, pet. ref'd).

Appellant argues that the jury should have been instructed regarding the regulations contained in the Memo, because the regulations "approve and allow the payment of funds to birth mothers for certain specified purposes." We disagree. The Memo plainly states that a licensed child-placing agency may provide *services,* and that general allowances or gifts are not allowed. In addition, the Memo's author, Chris Ros–Dukler of the Texas Department of Human Services, stated several times during her testimony that departmental policy forbids making cash payments to birth mothers, that the Memo states that the agency may only provide *services,* and that services are not equal to money. Further, Ms. Ros–Dukler unequivocally testified: "We always view child-placing agencies giving cash, lump sum, retroactive payments [to birth mothers] as constituting undue pressure [on a birth mother to relinquish her child for adoption]." Thus, it was an incorrect statement of the law for Appellant's requested instruction to categorize payments of money to Adamina as being for "legitimate purposes," and it was an incorrect statement of the law for the instruction to advise the jury that it could find Appellant not guilty if it found the payments of cash to Adamina were intended for housing costs, food, clothing, utilities, personal hygiene products, or transportation.

In addition, the statute under which Appellant was indicted is Penal Code § 25.11, which prohibits a person from offering to give, agreeing to give, or giving a thing of value to another for acquiring or maintaining the possession of a child for the purpose of adoption. TEX.PENAL CODE ANN. § 25.11(a) (Vernon 1989). Section 25.11 contains only three exceptions to its prohibitions: (1) a fee paid to a child-placing agency authorized by law; (2) a fee paid to an attorney or physician for services rendered in the usual course of legal or medical practice; or (3) a reimbursement of legal or medical expenses incurred by a person for the benefit of the child. TEX.PENAL CODE ANN. § 25.11(b) (Vernon 1989). Appellant produced no evidence or testimony that the cash paid Adamina was for any *lawful* purpose. The statute contains no exceptions relating to payments intended for housing costs, food, utilities, clothing, personal hygiene products, or transportation. Thus, the instruction requested by Appellant does not track the statute, and is contrary to the existing law. We find no error, and Appellant's twelfth point of error is overruled.

## VII. CONCLUSION

Having overruled all of Appellant's points of error, we affirm the judgment of the trial court.

J. CURTISS BROWN, C.J., concurs in the result only.

ELLIS, Justice, dissenting.

Finding myself in disagreement with the majority members of the panel, I respectfully file my dissent.