

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| ANTHONY MICHAEL BOWDEN, | § | No. 08-19-00057-CR |
| Appellant, | § | Appeal from the |
| v. | § | 384th District Court |
| THE STATE OF TEXAS, | § | of El Paso County, Texas |
| Appellee. | § | (TC# 20160D05559) |

**O P I N I O N**

A jury convicted Appellant Anthony Michael Bowden of murder and sentenced him to a term of thirty-five years' confinement and a maximum fine. In three evidentiary issues, Bowden seeks a reversal of his conviction and remand of his case for a new trial. His first two issues contend the trial court erred in denying his motion to suppress evidence of (1) a recorded interview he gave to law enforcement following his appearance before a magistrate judge where he had requested the appointment of counsel, and (2) of data contained on his cell phone, as well as records stored by his service provider, both of which were obtained from the execution of four search warrants. Lastly, in a third issue, he argues the trial court erred in admitting text messages between him and a third-party witness during the guilt/innocence phase of trial.

Finding no error, we affirm.

## I.   BACKGROUND

On August 8, 2016, Detective Joe Ochoa and other officers of the El Paso Police Department responded to an apartment at 212 Lisbon where a body had been discovered and reported to police. The victim was later identified as Eric Tijerina. At the scene, Detective Ochoa met with the victim's stepfather and other neighbors who were present at the time. In addition to learning the victim's identity, Detective Ochoa learned neighbors had earlier seen an individual walking into the victim's apartment. At least one neighbor gave a physical description of the unknown person.

To start his investigation, Detective Ochoa obtained a search warrant for the victim's phone records. On receipt of those records, officers noted they showed multiple phone calls and text messages were sent to a single number at a time preceding the victim's death. An additional search warrant confirmed the number traced to a person identified as Anthony Michael Bowden. With further investigating, Detective Ochoa soon learned that Bowden was a soldier stationed at Fort Bliss. From that information, he was able to secure a photograph of Bowden and confirmed it matched with the description given by the victim's neighbor. On September 13, 2016, Detective Ochoa and his partner, Detective Ray Sanchez, went to the Fort Bliss Criminal Investigations Division to arrange to meet with Bowden. Upon meeting, Bowden agreed he would speak with them back at their headquarters.

In a video-recorded interview, Bowden answered questions for nearly an hour. The recording of his statement was played to the jury at trial. At the start, Bowden disclosed he had been employed as a specialist with the U.S. Army for a little over three years and gave other

preliminary information. Detective Ochoa informed him that his name came up in an investigation of an incident that occurred several weeks prior, particularly on August 8, 2016. He next described that office procedures required he read, out loud, the legal rights afforded to Bowden.[1] After he informed Bowden he was not under arrest, Detective Ochoa then asked whether Bowden understood his rights and whether he knowingly, intelligently, and voluntarily wanted to waive his rights. Bowden replied, "Yes."

When told they were investigating a case involving the address of 212 Lisbon, Bowden initially denied being familiar with it or having heard of it. After Detective Ochoa mentioned they had records showing he had talked to somebody that lived in the area, Bowden revealed he had dating apps on his phone that he occasionally used to meet females. Bowden next signed a consent form allowing a search of his cell phone and its data and provided his passcode. Bowden maintained he had been in the area but denied visiting the apartment at the address where the victim lived. But, soon after Detective Ochoa disclosed that they had information indicating he had been to the apartment in question, Bowden revealed he went there about a month before August 8, but not on the date in question.

Bowden described, "So I met this girl online. . . . You know, went over to the -- and then it -- it wasn't a girl. . . . And I got raped." When asked to clarify, Bowden stated he met this person on Craigslist. He thought he was going to be "hooking up with a girl," and when he arrived, she was dressed like a girl but she looked different than her pictures. She was bigger than him. He next

---

[1] Reading from a card, Detective Ochoa informed Bowden he had the right to remain silent, the right to have a lawyer present to advise him prior to and during any questioning, the right to have a lawyer appointed if he could not afford one, the right to terminate the interview at any time, and the right to contact his consulate if he was not a citizen of the United States.

described they started "making out and stuff." "And then I come to find out that she had [male anatomy]." He continued, "But she -- she just continued, and I -- I was, like -- I was just in shock, like . . . and she just -- she finished." When asked for clarification, Bowden described he engaged in intercourse with that person. Afterwards, he claimed he got dressed and went home.

When pressed for more information, Bowden acknowledged he had been to the apartment but not on the date in question. Detective Ochoa then disclosed they knew he had been in the area on August 8. Bowden responded, "Can I terminate this and get a lawyer? I feel like you guys are trying to make me convict myself of something that I don't even know what the bad thing is, which I'm assuming she was murdered. That's the only bad thing that could be this bad, and you're trying to get me to convict myself. That's the only possible thing right now, because you're telling me something more happened, that I don't know more happened. You get, like, what I'm saying, from my point of view?" Detective Sanchez responded he understood exactly what Bowden was saying and he was on the right track, that is, the person was murdered. Bowden replied, "I didn't even want to say the rape thing because right there, motive." Detective Ochoa interjected by asking "What is it specifically that you said about a lawyer?" Bowden confirmed he wanted a lawyer and did not want to talk any more without one. The detectives ended their questioning and explained they would go check to see if they were done with Bowden's phone.

Shortly thereafter Detective Ochoa informed Bowden he was no longer free to go and placed him in a holding cell to await further paperwork. After preparing affidavits, Detective Ochoa next sought an arrest warrant and several search warrants from a magistrate judge. He transported Bowden with him to the magistrate court. After Bowden was formally arrested, the magistrate judge set a bond and administered *Miranda* warnings to him. Bowden requested court-

appointed counsel after the judge read his warnings. The magistrate judge also signed several search warrants including one for a sample of Bowden's DNA.

Detective Ochoa testified he returned with Bowden to police headquarters to execute the DNA search warrant and to have photographs taken of him. Afterwards, he returned Bowden to a holding cell at police headquarters and set about preparing an arrest card required for jail booking. He described that Bowden then summoned him over to the holding cell. As he approached, Bowden told him he wanted to tell him more about what took place. Detective Ochoa explained that—because Bowden had invoked his rights—a request for an interview had to come from him. After Bowden insisted, Detective Ochoa left his side and went to speak to his supervisor. A decision was made to allow Bowden to provide a second formal statement, recorded as before.

The second recording was also played to the jury. As before, Detective Ochoa read to Bowden his legal rights. After confirming that Bowden wanted to waive those rights, Detective Ochoa asked him to describe what happened. Bowden responded that what he had described in his first statement did occur, but it had occurred a month or two before August 8. Bowden then repeated he was raped as he had earlier described. Without mentioning a date, he next described he once again tried to find a partner and sent a picture of his face. The person he contacted then called him and it turned out it was the same guy with different pictures. Bowden described that the guy then said he would contact Fort Bliss and tell them: "I'm trying to pay him for sex or whatever, and he would put my picture on Craigslist under 'looking for guys,' like -- like I'm -- with my number and stuff." Bowden continued, "So he was, like, blackmailing me to come over again and also pay him $200 for his services or whatever, which I did not want to -- And then -- so I proceeded to go over there."

5

Bowden then described how he proceeded to the victim's apartment, while also revealing that, on the way, he stopped at a hardware store near the victim's apartment and bought a chisel. When he arrived at the victim's apartment, he went in with the chisel but "chickened out" and left it at the bottom of the stairs. He stated the guy started taking off Bowden's shirt and he thought, "I'm about to get raped again." When asked whether he brought money, Bowden responded he had left it in his car and would go get it. Instead of going to the car as he had said he would, Bowden described that he went and grabbed the chisel, then went back upstairs and "stabbed him to death." He further stated, "I, like, kicked him in the face, and he went down. And then I was just stabbing, like, everywhere, mainly in the back, until he stopped breathing."

Bowden was later charged by indictment with the murder of Eric Tijerina. Before trial, Bowden moved to suppress his video-recorded statements and the search warrants for his cell phone records. The trial court denied both motions to suppress and the case proceeded to a jury trial. At trial, the State presented evidence through several witnesses to include Detective Ochoa and other officers. Additionally, Dr. Janice Diaz-Cavalliery testified regarding the autopsy she performed on Tijerina. Dr. Diaz-Cavalliery testified she had concluded that Tijerina died due to a stab wound to his carotid artery. She described there were 24 stab wounds found on his body. Finally, one of the other witnesses who appeared for trial included a transgender female who testified to having exchanged text messages with Bowden over a dating app in April 2016. Along with the testimony of these witnesses, the State admitted several exhibits including the two video statements of Bowden, a chisel recovered from the center console of Bowden's car, and certain records of data recovered from Bowden's cell phone.

In the defense case-in-chief, Bowden recalled Detective Ochoa to the stand, and he

6

confirmed that, after interviewing about twenty people, his investigation revealed that Tijerina was "involved in prostitution, was a violent person, [and was] involved in drugs and exploitation[.]"Also, a forensic psychologist who performed psychological testing and conducted a pretrial interview of Bowden testified about his findings. He testified Bowden scored low on an IQ test; his score rated as being below 87 percent of the population. He determined that Bowden read at the level of a sixth grader.-The psychologist further testified that Bowden's behaviors were consistent with Autism Spectrum Disorder. Two other defense witnesses testified they knew the victim as Erykah Tijerina.

At the conclusion of trial, the jury returned a verdict of guilty and assessed punishment at confinement for a period of 35 years and a fine of $10,000. The trial court later imposed the jury's sentence and entered the judgment of conviction. This appeal followed.

## II. DISCUSSION

### A. The Sixth Amendment Right to Counsel

In his first issue, Bowden argues the trial court erred in not suppressing statements elicited from him during the interrogation that followed his appearance before a magistrate judge. In three sub-issues of that issue, he argues the trial court erred in ruling: (a) that he had been permitted reasonable time and opportunity to contact and consult with counsel as required by Article 15.17 of the Code of Criminal Procedure of Texas; (b) that he had knowingly, intelligently, and voluntarily waived his *Miranda* rights prior to his second interrogation and after he had twice requested counsel; and (c) that the State did not circumvent his right to counsel such that it was substantively violated.

7

### 1. *Standard of Review*

Appellate courts review a trial court's ruling on a motion to suppress under a bifurcated standard. *See State v. Arellano*, 600 S.W.3d 53, 57 (Tex. Crim. App. 2020). A trial court's findings of historical fact are afforded almost total deference if they are reasonably supported by the record. *See id.* (citing *Sims v. State*, 569 S.W.3d 634, 640 (Tex. Crim. App. 2019)). Especially when the trial court's findings are based on the evaluation of credibility and demeanor of a witness. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *State v. Alderete*, 314 S.W.3d 469, 472 (Tex. App.—El Paso 2010, pet. ref'd). We afford the same deference to mixed questions of law and fact when those questions also turn on an evaluation of credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Alderete*, 314 S.W.3d at 472. However, with regard to application of legal principles to a specific set of facts, we review those decisions *de novo*. *Alderete*, 314 S.W.3d at 472. We may uphold the trial court's ruling if it is supported by the record and correct under any theory of law applicable to the case. *State v. Stevens*, 235 S.W.3d 736, 739-40 (Tex. Crim. App. 2007). If the trial court does not issue findings of fact and conclusions of law, we infer necessary factual findings that support the trial court's ruling and view the record evidence that supports the implied fact findings in the light most favorable to that ruling. *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008).

### 2. *Controlling Law*

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defen[s]e." U.S. CONST. AMEND. VI. The right to counsel will attach when adversarial judicial proceedings are initiated, by means of a formal charge, preliminary hearing, indictment, information, or arraignment. *Brewer v. Williams*,

8

430 U.S. 387, 398 (1977). Once the adversarial judicial process begins, the Sixth Amendment guarantees the defendant the right to have counsel present at all critical stages of the criminal proceedings. *Maine v. Moulton*, 474 U.S. 159, 169 (1985); *Green v. State*, 872 S.W.2d 717, 719 (Tex. Crim. App. 1994).

In *Edwards v. Arizona*, the United States Supreme Court held that upon a suspect invoking his right to counsel, interrogation by the police must cease until counsel is provided or unless the suspect reinitiates the conversation himself. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981); *see also Cross v. State*, 144 S.W.3d 521, 526 (Tex. Crim. App. 2004). Following *Edwards*, a later case from the United States Supreme Court described *Edwards* as having established, in effect, "a prophylactic rule[] designed to protect an accused in police custody from being badgered by police officers in the manner in which the defendant in *Edwards* was." *Oregon v. Bradshaw*, 462 U.S. 1039, 1044 (1983); *Cross*, 144 S.W.3d at 526; *Engleton v. State*, No. 08-13-00077-CR, 2015 WL 1285202, at *4 (Tex. App.—El Paso Mar. 20, 2015, no pet.) (not designated for publication). Indeed, when a suspect indicates he or she is not willing to answer questions without counsel present, this unwillingness generally indicates he does not feel sufficiently comfortable with the pressures of custodial interrogation to respond to police inquiries without the assistance of an attorney. *Cross*, 144 S.W.3d at 526. *Edwards* further cautions, however, that a suspect is not powerless to countermand the election to speak only with the assistance of counsel. *Edwards*, 451 U.S. at 484-85; *Cross*, 144 S.W.3d at 526.

Under *Edwards,* courts must presume the suspect's discomfort in speaking to police without counsel present will persist unless the suspect himself initiates further conversation about the investigation. *Cross,* 144 S.W.3d at 526. And, in *Oregon v. Bradshaw*, the Court established a

9

two-step procedure to determine whether a suspect has waived his previously invoked right to counsel. 462 U.S. at 1044; *Cross*, 144 S.W.3d 526-27. First, there must be proof that the suspect himself initiated further communications with the authorities after previously invoking his right to counsel, and second, there must be proof that after reinitiating such communication, the suspect made a valid waiver of his right to counsel. *Bradshaw*, 462 U.S. at 1044; *Cross*, 144 S.W.3d at 526-27; *see also McCarthy v. State*, 65 S.W.3d 47, 51 n.6 (Tex. Crim. App. 2001) (acknowledging the *Edwards* rule is satisfied if the arrestee reinitiates the conversation).

### 3. Analysis

#### a. Bowden initiated further communication with the Detectives

At the pretrial motion to suppress hearing, Detective Ochoa testified Bowden invoked his right to counsel during their first interview and the detectives terminated their questioning. Based on the investigation up to that point, Detective Ochoa informed Bowden he would be arrested. He then worked on an affidavit to initiate his formal arrest and to charge him with murder. He also prepared documents for securing warrants for his DNA and to search his vehicle. At 4:40 p.m., Detective Ochoa transported Bowden to appear before a magistrate judge. The magistrate judge read Bowden his *Miranda* warnings for the second time that day and signed a warrant for his arrest. Bowden requested court-appointed counsel after the judge read him the warnings. Along with the arrest warrant, the judge also issued a search warrant to obtain a DNA sample.

The detectives then drove Bowden back to the station to allow a crime scene officer to collect the DNA samples. Detective Ochoa testified on direct and cross-examination that he did not speak with Bowden regarding the case during their return trip. On arrival, he returned Bowden to his holding cell and continued the process of preparing to book him into the jail. As Detective

10

Ochoa walked over to his supervisor to notify him that he was ready to transport Bowden to the county jail, he described that Bowden began "waiving [Detective Ochoa] over." When Detective Ochoa approached him, Bowden expressed that he wanted to tell him everything that took place and wanted his story to be part of the case. Detective Ochoa testified he reminded Bowden that he could no longer communicate with him; but, he claimed, Bowden insisted. Detective Ochoa testified he then told him "it has to come from you."

Detective Ochoa testified Bowden responded he wanted it to be done. Detective Ochoa described he explained he would need to generate a second formal interview, they would need to go back into the room where they sat before, and basically go through the same procedure as done originally. After Bowden confirmed he wanted to do that, Detective Ochoa left him to speak to his supervisor. He then prepared the room and they went back in. After speaking with his supervisor, Detective Ochoa initiated a second video-recorded interview.

At the start, he marked the time as 5:58 p.m. He began with a summary detailing that Bowden had been interviewed earlier that day at a time when he was not under arrest. Bowden agreed with the summary of events and said he wanted "the truth out there." Detective Ochoa then read Bowden his *Miranda* warnings for a third time that day; Bowden responded that he understood and wished to waive his rights. He then participated in the interview without ever mentioning that any promises were made or that he had been threatened by the detectives. He also never requested that an attorney be present or that he be given a chance to contact one.

Bowden briefly testified at the hearing and described what happened as he rode in the detective's vehicle after he had received warnings from the magistrate judge. During the ride, he testified the officers told him that if he didn't tell his side of the story the jury would not hear it

11

and they would simply see him as a murderer. He further testified, "And if I told my side[,] it could possibly draw my charges to a lesser degree, and that they had already caught me. They were just trying to help me." He further claimed, he did not respond to those comments during the ride. Bowden also acknowledged he never mentioned comments were made during the car ride when he gave his second recorded interview.

Viewing the evidence in the light most favorable to the trial court's ruling and assuming implicit findings of fact supported by the record were made, we conclude that Bowden himself reinitiated contact about his case with the detectives. *Bradshaw*, 462 U.S. at 1044; *Engleton*, 2015 WL 1285202, at *4. The first step of the *Edwards* test was fully satisfied. *Edwards*, 451 U.S. at 484-85; *Cross*, 144 S.W.3d at 526. Even though Bowden testified he felt pressured by the officers to tell his side of the story before he gave his second interview, Detective Ochoa denied having any conversation about the case during the car ride. As the sole judge of the credibility of the witnesses, the trial court was free to find Detective Ochoa more credible and accept his version of events over the version given by Bowden. *See Arellano*, 600 S.W.3d at 57.

Having found the first step of *Edwards* fully satisfied, we turn next to the question of whether Bowden's waiver of his right to counsel was made knowingly, intelligently, and voluntarily.

### b. Bowden Knowingly, Intelligently, and Voluntarily Waived his Rights

Essentially, Bowden asserts he did not knowingly, intelligently, and voluntarily waive his rights to counsel prior to the second video-recorded statement after previously requesting an attorney. We address this step together with Bowden's sub-argument arguing he was not provided reasonable time and opportunity to consult with counsel as required by Article 15.17 of the Code

12

of Criminal Procedure. Bowden argues he was interrogated during a critical stage of the prosecution in violation of his right to counsel.

The State has the burden of proving through a preponderance of the evidence that a defendant knowingly, intelligently, and voluntarily waived his rights. TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2(b); *Joseph v. State*, 309 S.W.3d 20, 24 (Tex. Crim. App. 2010). In evaluating whether the waiver was knowingly, intentionally, and voluntarily made, we determine: (1) whether the waiver was voluntary by being a product of a free and deliberate choice rather than by intimidation, coercion, or deception, and (2) whether it was made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon. *Joseph*, 309 S.W.3d at 25; *Moreno v. State*, No. 08-18-00179-CR, 2020 WL 7090696, at *3 (Tex. App.—El Paso Dec. 4, 2020, no pet.) (not designated for publication). We consider the totality of the circumstances surrounding the interrogation including the defendant's experience, background, and conduct. *Joseph*, 309 S.W.3d at 25. A showing of an express waiver is not required. *Id*. An implied waiver will be evidenced by a showing that *Miranda* warnings were given and understood by the defendant, and the defendant engaged in a course of conduct indicating waiver. *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010). Conduct indicating waiver includes participating in the interview and making an uncoerced statement. *Id*.

Here, at the start of the interview, the recording of the second interview shows that Detective Ochoa advised Bowden again of his previously invoked right to counsel seeking to ensure that Bowden in fact wanted to waive his rights and reinitiate their interview. Bowden indicated he understood his rights and wanted "the truth out there." Detective Ochoa reiterated that Bowden had already asked for a lawyer yet he had still indicated he wanted to talk to them. Bowden

13

responded, "Yes." Detective Ochoa replied he would need to make sure that Bowden understood his rights. As before, he read Bowden his *Miranda* rights and asked him to confirm that he understood those rights but knowingly, intelligently, and voluntarily waived those rights. Bowden answered, "Yes." Detective Ochoa followed by stating, "And you care to talk to us about what took place?" Bowden answered "Yes." Starting with an open-ended question, Detective Ochoa asked, "What happened?" Bowden began responding from the point he had left off in his first interview.

Throughout the nearly 40-minute interview, there are no threats or promises made to Bowden or any mention by him of previous threats or promises having been made prior to the recording. Furthermore, Detective Ochoa himself testified that no promises, threats, or coercive tactics on his part were used in attempting to get Bowden to reinitiate the interview. Detective Ochoa testified he did not discuss anything pertaining to Bowden's case between his first invocation of his rights to the point when Bowden summoned him over to the holding cell to get his attention. Detective Ochoa also testified he would have given Bowden an opportunity to contact a lawyer if Bowden made such a request, but he never requested that he be permitted to call a lawyer.

At the suppression hearing, Bowden testified solely about the short car ride back to the police station after the magistrate hearing, asserting the detectives tried to get him to tell the whole story. He testified the detectives told him, "if [he] didn't tell [his] side of the story, the jury wouldn't hear it, and they would just see [him] as a murderer," and he could possibly get his charges to a lesser degree. Bowden admitted he did not mention the statement the detectives made to him during the car ride at any point during his second video-recorded statement.

14

As the sole judge of credibility of witnesses, the trial court was able to weigh Bowden's testimony against Detective Ochoa's testimony and we must give deference to the trial court's resolution. *See Wells v. State*, No. 08-09-00110-CR, 2010 WL 3009306, at *5-6 (Tex. App.—El Paso July 30, 2010, pet. ref'd) (not designated for publication) (finding an implied waiver when defendant participated in an interview with authorities immediately following being read his rights and not requesting counsel or terminating the interview). The record supports the trial court's inferred finding that Bowden was not under coercion or duress but rather gave his statement voluntarily. *See Joseph*, 309 S.W.3d at 25; *Moreno*, 2020 WL 7090696, at *3.

Bowden also asserts that he lacked "full awareness" of the nature of his rights because of "the violation of his rights in the first interview" and he believed the rights to be "insignificant" and therefore "the decision to waive that right was insignificant." Bowden does not cite to any authority, and we are not aware of any, indicating that a detective requesting a clarification of an invocation of a right to counsel is itself a violation. Without more, we are hard pressed to find that Bowden lacked awareness of his rights to intelligently waive them. *See Brown v. State*, No. 06-17-00047-CR, 2018 WL 387782, at *2-3 (Tex. App.—Texarkana Jan. 12, 2018, no pet.) (mem. op., not designated for publication) (finding no violation of defendant's rights when officers asked whether defendant wanted to continue the interview or wanted a lawyer present and continued the interview). Here, the officers stopped the interview after getting their clarification that Bowden wanted to terminate and had no further communication with defendant until Bowden requested to reinitiate another interview. The record supports Bowden affirmatively acknowledged he understood his rights and wished to speak with the detectives. Furthermore, Bowden did not appear to be under the influence but rather appeared to have the mental capacity to speak clearly and

cogently with the detectives. *Moreno*, 2020 WL 7090696, at \*5.

Lastly, Bowden argues that his rights pursuant to article 15.17 were violated because he was not afforded reasonable time and opportunity to consult with counsel after meeting with the magistrate.[2] Bowden never requested to call an attorney and the process to determine Bowden's eligibility for a court-appointed attorney was started and showed he initially failed to qualify. Beyond informing a suspect of his rights, the State has no requirement to provide other assurances or explanations. *See Engleton*, 2015 WL 1285202, at \*5. The record shows no interrogation began immediately following the magistrate hearing; but rather, it started only after Bowden himself reinitiated communication about his case with the detective.

Under these circumstances, the evidence supports the trial court's finding that Bowden understood and waived his rights, and the trial court did not abuse its discretion in finding Bowden had waived his rights with the requisite awareness to make the waiver knowingly and intelligently. *See Joseph*, 309 S.W.3d at 26 (finding the defendant voluntarily waived when there was no showing of coercion or undue promises, defendant was warned about his rights, willingly participated in a six-hour interview, and did not request an attorney or ask to stop the interview); *Torres v. State*, 543 S.W.3d 404, 411-12 (Tex. App.—El Paso 2018, pet. ref'd) (finding the defendant voluntarily waived his rights when there was no evidence of coercion and defendant

---

[2] Bowden relies on the concurring opinion of Justice Alcala to argue that he was not afforded an opportunity to attempt to contact counsel. *Pecina v. State*, 361 S.W.3d 68, 81-83 (Tex. Crim. App. 2012) (Alcala, J., concurring) (arguing an additional warning should be given to defendants after the magistrate hearing including, "If you desire to have an attorney present during police interrogation, you must make that request at the time of the police questioning."). We reject this argument as Bowden was never questioned or interviewed by the detectives following his magistrate hearing until he himself reinitiated communication. Here, Bowden reinitiated contact and knowingly, intentionally, and voluntarily waived his rights before making his second statement as opposed to a custodial interrogation immediately following his magistrate hearing. *Serrano v. State*, No. 03-14-00516-CR, 2015 WL 6835463, at \*3 (Tex. App.— Austin Nov. 6, 2015, no pet.) (mem. op., not designated for publication).

replied "Yes" after being warned and never asked that the interview terminate or invoked his right to counsel through the duration of the interview).

The totality of the circumstances shows full compliance with the *Edwards* test and supports a finding that Bowden's waiver was made knowingly, intentionally, and voluntarily, and in compliance with article 38.22.

Bowden's first issue is overruled along with each sub-issue.

## B. Search Warrants

In his second issue, Bowden argues the trial court erred in not suppressing evidence obtained from the execution of four warrants for data contained on his cellular device, and records stored by his service provider. In three sub-issues, he further argues the trial court erred in ruling: (a) the warrants all satisfied the constitutional requirements of particularity and probable cause; (b) the warrants all satisfied the dictates of Article 18.21 of the Code of Criminal Procedure; and (c) the third warrant for a dump of cell data physically stored on his cellular device had not facially lapsed in its authority.

### 1. *Standard of Review*

We typically review a trial court's ruling on a motion to suppress by using a bifurcated standard of review giving almost total deference to credibility determinations and reviewing *de novo* the trial court's application of the law. *State v. McLain*, 337 S.W.3d 268, 271 (Tex. Crim. App. 2011). However, a trial court's determination of probable cause to support issuance of search warrants, require no credibility determinations. *Id*. Accordingly, the trial court is limited to the four corners of the affidavit, and we therefore apply a highly deferential standard of review to a magistrate's decision to issue a warrant. *Id*. There is a constitutional preference for searches

17

conducted pursuant to a warrant over warrantless searches. *Id*. If the magistrate had a substantial basis for finding probable cause existed, we must uphold the magistrate's probable cause determination. *Id*. We must not analyze the affidavit in a hyper-technical manner but in a commonsensical and realistic manner. *Rodriguez v. State*, 232 S.W.3d 55, 61 (Tex. Crim. App. 2007). Given that a magistrate may draw reasonable inferences, we defer to all reasonable inferences that the magistrate could have made. *Id*.

### 2. *Applicable Law*

Pursuant to the Fourth Amendment, probable cause supported by oath or affirmation describing the place to be searched and the things to be seized is required in order for a warrant to issue. U.S. CONST. AMEND. IV. Texas law requires that no search warrant shall be issued, "unless sufficient facts are first presented to satisfy the issuing magistrate that probable cause does in fact exist for its issuance." TEX. CODE CRIM. PROC. ANN. art. 18.01(b). In every instance requesting a search warrant be issued, a sworn affidavit must be filed and set forth substantial facts establishing probable cause. *Id*.

Under the Fourth Amendment, authorities may not embark on a general search of a cell phone as cell phone users have a reasonable expectation of privacy. *Butler v. State*, 459 S.W.3d 595, 601 n.3 (Tex. Crim. App. 2015). To comply with the Fourth Amendment, a search warrant must describe the items to be seized with sufficient particularity so to avoid the possibility of a general search. TEX. CODE CRIM. PROC. ANN. art. 18.01(b); *Thacker v. State*, 889 S.W.2d 380, 389 (Tex. App.—Houston [14th Dist.] 1994, pet. ref'd). "The constitutional objectives of requiring a 'particular' description of the place to be searched include: 1) ensuring that the officer searches the right place; 2) confirming that probable cause is, in fact, established for the place described in

18

the warrant; 3) limiting the officer's discretion and narrowing the scope of his search; 4) minimizing the danger of mistakenly searching the person or property of an innocent bystander or property owner; and 5) informing the owner of the officer's authority to search that specific location." *Long v. State*, 132 S.W.3d 443, 447 (Tex. Crim. App. 2004).

The items to be seized must be described with sufficient particularity such that the officer that executes has no discretion to decide what items may be seized. *Thacker*, 889 S.W.2d at 389. But the requirements for particularity of the description may vary depending on the nature of the thing to be seized. *Id*. A sworn affidavit for an evidentiary search warrant must set forth specific facts to establish probable cause including "(1) that a specific offense has been committed, (2) that the specifically described property or items that are to be searched for or seized constitute evidence of that offense or evidence that a particular person committed that offense, and (3) that the property or items constituting evidence to be searched for or seized are located at or on the particular person, place, or thing to be searched." TEX. CODE CRIM. PROC. ANN. art. 18.01(c); *Sims v. State*, 526 S.W.3d 638, 644 (Tex. App.—Texarkana 2017), *aff'd*, 569 S.W.3d 634 (Tex. Crim. App. 2019). When dealing with computers or other electronic devices, a warrant must limit the search to evidence of specific crimes or specific materials. *Farek v. State*, No. 01-18-00385-CR, 2019 WL 2588106, at *7-8 (Tex. App.—Houston [1st Dist.] June 25, 2019, pet. ref'd) (mem. op., not designated for publication) (citing *United States v. Burgess*, 576 F.3d 1078, 1091 (10th Cir. 2009)). A warrant that permits the search of all computer records without description or limitation will not meet Fourth Amendment particularity requirements. *Farek*, 2019 WL 2588106, at *8. However, a search limited to those records related to the offense at issue as set forth in the affidavit is appropriately limited. *Id*.

*3. Analysis*

**a. Probable Cause, Particularity Requirements, and Facially Valid**

All four warrants at issue contained probable-cause affidavits that were similar in detail and contained the following facts. In all, the affiants stated the victim's stepfather sought help when he found the victim dead in the upstairs bedroom of their shared apartment. The victim was a transgender prostitute and, according to her cousin, was scheduled to meet a client at her apartment just prior to her murder. About an hour before police arrived at the scene, the victim's neighbor witnessed a tall, thin, light-skinned African American male arrive at the victim's apartment. There was no sign of a forced entry, but the crime scene reflected there had been a struggle. The victim's phone was missing from the scene and a search warrant—not at issue here— was obtained for the victim's cell phone records. The records revealed a certain number had multiple completed calls with the victim at the date and time in question. Bowden was identified as being linked to the number and additional information was obtained describing Bowden. With this information, the affiants requested Bowden's cell phone records. We will address Bowden's first and third sub complaints regarding each search warrant in turn.

**August 12, 2016 Search Warrant**

Detective Ochoa was the affiant for the first warrant at issue—2016-384-017, issued on August 12, 2016—(August 12 warrant), which sought Bowden's T-Mobile cell phone records from August 7, 2016, through August 9, 2016. The August 12 warrant permitted Bowden's T-Mobile cell phone records to be searched for "cell phone records" pertaining to the cellular number identified as Bowden's cell phone number. The incorporated affidavit set forth pertinent facts to establish probable cause including:

20

- affiant was investigating the murder of the victim;
- the crime scene revealed evidence of a struggle but no indicators of forced entry;
- the victim's cell phone was missing from the scene;
- an initial search warrant for the victim's call records was secured;
- the initial search revealed a certain number to have multiple completed calls with the victim during the date/time in question;
- Bowden was identified as the owner of said phone number; and
- a neighbor of the victim described a man who walked into victim's apartment about an hour prior to police arriving at the scene matched the description of Bowden.

Bowden argues the August 12 search warrant does not provide any type of statement of probable cause as the request was made to "continue the homicide investigation" and the warrant was sought as a preliminary investigatory tool in an attempt to develop probable cause. Applying a common-sense reading to the affidavit, we conclude it contained sufficient facts to support the trial court's probable cause finding.

Through the affidavit, Detective Ochoa stated the investigation showed the crime scene had signs of a struggle but no sign of forced entry. The affidavit also stated the victim was a transgender prostitute who met with clients at her apartment, and she was scheduled to meet with a client at her apartment at the time of her murder. When this information is paired with the victim's neighbor witnessing someone who matched the description of Bowden entering the victim's apartment near the time of the murder, together the information created a substantial basis for believing the victim had communicated with Bowden near the time of her murder. Under the totality of circumstances, the magistrate reasonably inferred Bowden's cell phone contained information regarding the murder of the victim. *Walker v. State*, 494 S.W.3d 905, 909 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd).

Bowden further argues the August 12 warrant did not include any statements of particular

21

items to be searched or seized but instead incorporated the affidavit by reference. However, particularity requirements may be satisfied when described in the affidavit and the affidavit is attached and incorporated into the search warrant. *Strange v. State*, 446 S.W.3d 567, 571 (Tex. App.—Texarkana 2014, no pet.); *Farek*, 2019 WL 2588106, at *6. The search warrant sought information pertaining to Bowden's cell phone and incorporated the attached affidavit. The affidavit was limited to the dates August 7, 2016, through August 9, 2016, and described the victim's murder with detail. *See Roberts v. State*, Nos. 07-16-00165-CR, 07-16-00166-CR, 2018 WL 1247590, at *6 (Tex. App.—Amarillo Mar. 9, 2018, pet. ref'd) (mem. op., not designated for publication) (finding the search warrant was not overbroad when the attached affidavit established a sufficient nexus between the items to be searched and the offenses being investigated); *Farek*, 2019 WL 2588106, at *8 (holding a search warrant was not overbroad when the supporting affidavit directly linked the facts and circumstances of the investigation to the items to be seized, even though the search warrant authorized a search for "[a]ny and all other digital data" and "[a]ny and all deleted digital data"). The warrant requesting "cell phone records" for Bowden's phone was not overly broad when the incorporated affidavit to that request specified the type of data sought and likely to contain relevant evidence, limited the time frame of the evidence, and established the nexus between the records and the victim's murder. *Farek*, 2019 WL 2588106, at *8. Accordingly, the trial court did not err in denying Bowden's motion to suppress as to the August 12 search warrant.

**September 14, 2016 and September 27, 2016 Search Warrants**

Detective Michael Aman was the affiant for the second and fourth search warrants at issue—383-091416-02, issued on September 14, 2016, and 383-092716-01, issued on September

27, 2016—(September 14 and September 27 warrant). The September 14 and September 27 warrants both permitted the search and seizure of call detail records, subscriber information, and location data for Bowden's phone number for the five months prior to the victim's murder based on Bowden's admission that he had a prior sexual encounter with the victim sometime during the months before her murder. The facts set out in the affidavit were identical to those set out in the August 12 warrant with the addition that "B[owden] was identified as the murder suspect" and he had provided a voluntary statement admitting to killing the victim.

Bowden asserts the September 14 and September 27 warrants did not present probable cause because the only justification offered for the search and seizure of the records is that they would show previous contacts between the victim and the suspect. Bowden asserts the affiants were using the search as a way to establish probable cause. However, under the totality of circumstances, we find the affidavits for these warrants establish a fair probability that evidence of the victim's murder would be found on Bowden's cell phone. *See Walker*, 494 S.W.3d at 909 (holding under the totality of circumstances, the trial court properly concluded there was a fair probability that evidence relating to the capital murder would be found on the appellant's cell phone, when he confessed to shooting the victim and there was evidence of multiple text messages and phone calls around the time of the shooting).

Bowden also asserts the September 14 and September 27 warrants were overbroad in their request. However, as we found for the August 12 warrant, these warrants did not attempt to allow an unlimited search but rather provided a time limit and facts that the search was for evidence that was relevant to the victim's murder. *Farek*, 2019 WL 2588106, at *10 (finding that any ambiguity or potential overbreadth in the warrant's phrase "including but not limited to" was cured by

23

limiting the search to evidence of specific crimes or specific types of data that would be seized); *Duenas v. State*, No. 08-18-00022-CR, 2020 WL 858640, at *2 (Tex. App.—El Paso Feb. 21, 2020, no pet.) (not designated for publication) (holding the magistrate could infer that fair probability of evidence existed and would likely be found on the named computer or other computers or storage devices in defendant's possession). The trial court did not err in denying Bowden's motion to suppress as to these search warrants.

**September 13, 2016 Search Warrant**

Detective Michael Aman was also the affiant for the third search warrant—JMAG16-04772—(September 13 warrant). The September 13 warrant permitted a search and seizure of all records physically stored on Bowden's cell phone, specifically to include subscriber information, image files, video files, text messages and log, and contacts. Again, the September 13 warrant reiterated the facts established in the other three affidavits. Additionally, the affidavit stated Bowden admitted to having sex with the victim near the time of her murder. Furthermore, Bowden's friend and fellow soldier stated that Bowden had told him that he had killed the victim. The affidavit for the third warrant was signed on September 13, 2016, however, it reflected it was issued on August 13, 2016, and executed on August 16, 2016.

Bowden argues the warrant requests records without any statement of probable cause as to particularly listed types of records and was a general warrant. We disagree. With the belief that Bowden's cell phone would lead to information surrounding the victim's murder, there was a substantial basis for the trial court to determine probable cause. *Martinez v. State*, No. 13-15-00441-CR, 2017 WL 1380530, at *3 (Tex. App.—Corpus Christi Feb. 2, 2017, no pet.) (mem. op., not designated for publication) (finding magistrate had substantial basis for finding probable cause

24

existed to search defendant's cell phone based on facts that he communicated with his cohorts via cell phone). Furthermore, as with the previous three warrants, the September 13 warrant was not overly broad but specifically identified the items to be seized in accordance with the victim's murder. *Farek*, 2019 WL 2588106, at \*6.

In his third sub-issue, Bowden argues the September 13 warrant was facially defective based on the listed dates and therefore lapsed in authority. The supporting affidavit is dated September 13, 2016, while the warrant itself is dated August 13, 2016, and returned August 16, 2016. The State asserts the date was a typographical error that did not invalidate the warrant.

The Texas Court of Criminal Appeals has held that technical discrepancies concerning dates and times will not automatically vitiate the validity of search or arrest warrants. *Green v. State*, 799 S.W.2d 756, 759 (Tex. Crim. App. 1990). When technical defects are at issue, the State can offer explanatory testimony to show the defect is purely technical or clerical. *Somoza v. State*, 481 S.W.3d 693, 701 (Tex. App.—Houston [1st Dist.] 2015, no pet.). Here, the affiant of the warrant, Detective Aman, testified the discrepancies in the dates between the affidavit and the warrant was a "typo" and what he swore to in the affidavit was true on September 13, 2016. Additionally, Detective Aman testified that it would have been impossible for the warrant to have been issued on August 16, 2016, as he did not have access to Bowden's "tangible" phone at that time. For these reasons, the trial court finding the discrepancy to be a typographical error which did not invalidate the warrant was supported by the record. *See id.* at 703 (finding the evidence, including the officer's testimony regarding the correct time of the traffic stop and explaining the noted time was a typographical error, supported the trial court's finding). The trial court did not err in denying Bowden's motion to suppress as to the September 13 search warrant.

### b. Article 18.21 of the Texas Code of Criminal Procedure

In his second sub-issue to Issue Two, Bowden argues the requested records were governed by Article 18.21 of the Texas Code of Criminal Procedure. Bowden reiterates that the complained of search warrants lacked "sufficient probable cause" to satisfy article 18.21. Bowden asserts no other authority and no specific argument as to this sub-issue.

The Texas Court of Criminal Appeals has concluded that suppression is not an available remedy under Article 18.21 of the Texas Code of Criminal Procedure unless the issuance of the search warrant also violated state or federal constitutional provisions. *Sims v. State*, 569 S.W.3d 634, 637-38 (Tex. Crim. App. 2019) (holding appellant could not invoke article 38.23(a) to remedy a non-constitutional violation of either the Stored Communications Act or former article 18.21 due to the statutes exclusivity clauses); *Hunter v. State*, No. 05-18-00458-CR, 2019 WL 2521721, at *8 n.4 (Tex. App.—Dallas June 19, 2019, pet. ref'd) (mem. op., not designated for publication); *see* TEX. CODE CRIM. PROC. ANN. art. 18.21, § 5A(c) (stating search warrants for electronic customer data may not be issues without a sworn affidavit with "sufficient and substantial facts to establish probable cause" of a specific offense being committed and the data will evidence a particular person committed the offense), repealed by Acts 2017, 85th Leg., ch. 1058 (H.B. 2931), § 5.01(2), eff. Jan. 1, 2019. For these reasons, we overrule Bowden's second sub-issue.

### c. Good Faith Exception

In his last sub-issue, Bowden asserts the search warrants could not be relied upon in good faith because they were plainly invalid. Already having found that the four complained of search warrants were valid and the trial court did not err in denying the motion to suppress, we need not address Bowden's good faith exception argument. *See* TEX. R. APP. P. 47.1

26

Bowden's second issue is overruled.

### C. Admission of Text Messages

Lastly, in his third issue, Bowden argues the trial court erred by admitting text messages during the guilt/innocence phase of his trial over his objections. Under his three sub-issues of that issue Bowden contests: (a) whether the text messages were relevant to any ultimate fact issue; (b) whether the probative value of the text messages, if any, substantially outweighed their prejudicial effect; and (c) whether Bowden was harmed by the erroneous admission of the messages.

### 1. *Standard of Review*

A trial court's decision to admit evidence is reviewed for an abuse of discretion. *Colone v. State*, 573 S.W.3d 249, 263-64 (Tex. Crim. App. 2019); *Marcee v. State*, No. 08-18-00148-CR, 2020 WL 4047970, at *2 (Tex. App.—El Paso July 20, 2020, no pet.) (not designated for publication). The trial court's decision on the admissibility of evidence will be upheld if it falls within the "zone of reasonable disagreement." *Beham v. State*, 559 S.W.3d 474, 478 (Tex. Crim. App. 2018).

### 2. *Applicable Law*

Evidence is relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action. TEX. R. EVID. 401. Relevant evidence is admissible unless the United States Constitution, the Texas Constitution, or Texas law provide otherwise. TEX. R. EVID. 402. "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." TEX. R. EVID. 404(b)(1). However, such evidence will be admissible when it is relevant to prove something other than conformity

27

with character, as being offered to rebut a defensive theory. *Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007).

There is a presumption that relevant evidence will be more probative than prejudicial. *Id*; *Marcee*, 2020 WL 4047970, at *2. However, the trial court may exclude relevant evidence if it finds the probative value of the evidence is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence. TEX. R. EVID. 403; *Marcee*, 2020 WL 4047970, at *2. The probative value of evidence refers to how strongly it serves to make more or less probable the existence of a fact of consequence to the case as well as the proponent's need for the item. *Casey*, 215 S.W.3d at 879. Unfair prejudice is the tendency to suggest that decisions may be made on an improper basis—an emotional one. *Marcee*, 2020 WL 4047970, at *3. All probative evidence is always prejudicial to one side, therefore, rule 403 only applies when a clear disparity between the degree of prejudice and the probative value of offered evidence exists. *Hernandez v. State*, 390 S.W.3d 310, 324 (Tex. Crim. App. 2012).

Upon a proper rule 403 objection, the trial court must balance the following factors: "(1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for the evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted." *Gigliobianco v. State*, 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006).

*3. Analysis*

During the guilt/innocence phase and outside the presence of the jury, the State informed the trial court that Raul "Chyna" Fierro (Chyna) would testify that Bowden sent her a message asking her to have sex knowing she was a transgender female. Bowden objected to the admission of the messages on relevancy grounds and that the prejudicial impact of the evidence outweighed its probative value. The State argued the messages were relevant to counter Bowden's claim that the first sexual encounter with the victim became nonconsensual when he discovered, during sex, the victim was male. Bowden objected that it was never said by the defense that he "was raped because it was a man, and not a wom[a]n." The trial court overruled Bowden's objections and the text messages were admitted.

Through the testimony of Chyna, the State introduced photographs of the message exchanges between Bowden and Chyna on a dating app called "MeetMe." Chyna's "MeetMe" profile contained pictures of her and listed that she was a "trans girl." On April 28, 2016, Bowden sent Chyna a message through the app that stated, "Hey what's up with you." Chyna replied two days later with a smiley face. The next message occurred on August 19, 2016, when Bowden sent another message to Chyna that stated "DTF," which Chyna testified meant "down to f***." After a few messages were exchanged, Chyna replied, "You done it to a trans before?" Bowden replied he did not know she was transgender. Bowden then asked, "so where would we do this." Chyna clarified Bowden continued to attempt to meet up with her, but they never did. On cross-examination, Chyna described a person could not send a message through the dating app without first viewing her profile which listed she was a transgender woman.

### a. Relevancy

Bowden argues the admission of the text messages between himself and Chyna were irrelevant to prove any material fact of the State's case. Countering, the State argues it offered the messages to disprove Bowden's claim of self-defense. During the first video-recorded statement, Bowden stated he initially did not know the victim was male and was in shock when he discovered that fact. He claimed he was raped but then continued to engage in oral sex and anal intercourse with Tijerina. In the second video-recorded statement, Bowden asserted that Tijerina had started to remove his shirt and he thought he was about to get raped again. When he asked for his money, Bowden responded he had left it in his car. Then he went and retrieved the chisel from the stairs where he left it, went back upstairs, and returned to stab him to death. Throughout trial, Bowden presented other evidence asserting the victim was a prostitute who exploited her clients by threatening them with exposure. Bowden also presented evidence that he had a below average IQ and had a mild form of Autism Spectrum Disorder, which limited his ability to deal with threats, especially threats of sexual assault. The State asserts the messages were relevant to rebut Bowden's claims he considered the victim's actions to be rape only after he discovered the victim was male. The State asserts the evidence showed Bowden did not kill the victim in defense of a rape, but rather, because the victim had tried to blackmail him.

We agree the text messages were relevant to rebut Bowden's assertion he was surprised to learn the victim was a man, that he was raped, and, therefore, he had a reasonable belief that deadly force was imminent at the time of the victim's murder. The text messages at issue between him and Chyna tended to show Bowden had a prior history of interacting with another transgender female, making those messages relevant to disprove his contention he was surprised to learn the

30

victim was a transgender female and feared he would be sexually assaulted. *Cf. Reighley v. State,* 585 S.W.3d 98, 106 (Tex. App.—Amarillo 2019, pet. ref'd) (holding text messages where defendant stated he had previously had oral sex with a fourteen-year-old girl was admissible to rebut the defense that he believed the minor, for which he was charged with online solicitation of a minor, was an adult).

### b. Probative value outweighed by unfair prejudice

Bowden argues that even if the messages are deemed relevant, the probative value was outweighed by its prejudicial effect. First, Bowden argues that showing he sought out a sexual encounter with another transgender female does not disprove that he was raped by the victim. He argues the element of surprise or shock when he found out that the victim was a male was never brought up as part of his defense at trial. He contends the State only sought to introduce the previous text messages with Chyna to invoke the jury's hostility and "sway them to dislike" him. However, during the first video-recorded interview, Bowden himself described his encounter as consensual up to the point he learned the victim was male. Additionally, Bowden introduced evidence from a licensed psychologist testifying to Bowden's perceptions and actions as being consistent with those of a person who is diagnosed with autism. The psychologist testified that when Bowden went to the victim's apartment on August 8, and the victim began taking off Bowden's shirt, he believed he would be raped again and felt threatened. The psychologist also testified that a person with autism would react differently to threats than others. The psychologist testified that Bowden's reaction to feeling threatened would not be typical and would be "very concrete" because he was a "one-track thinker[]," and his reasonable belief of the threat would be different than others. The State sought to disprove Bowden's assertion he believed he was in fear

31

of being raped because he was not raped during the first encounter with the victim. Whether the jury believed Bowden reacted aggressively based on his perception he was being raped became a fact of consequence to the litigation. *Hernandez*, 390 S.W.3d at 323; *Marcee*, 2020 WL 4047970, at \*4. For that reason, the text messages with Chyna were probative to that issue and the evidence was needed by the State to disprove Bowden's claim of self-defense based on feeling he would be raped again.

Bowden complains the messages did not help the jury decide the question of self-defense on a rational basis but instead caused the jury to decide that issue on an improper basis. Also, Bowden argues the evidence distracted the jury from other evidence that Bowden was fearful of the victim given the victim's reputation for violence. On this point, we do not find the evidence would distract or confuse the jury because the messages did not contain excessively vulgar language and did not contain any photographs that would shock the jury. The messages in themselves were not likely to generate any emotional response from the jury. We also do not find the jury would give the evidence undue weight. Lastly, the State did not spend an inordinate amount of time introducing the evidence. Chyna's entire testimony consisted of twenty pages out of nearly two hundred pages of testimony during the guilt/innocence phase of the trial. Additionally, Chyna was only one witness out of six witnesses, the others testifying more extensively. We recognize that all probative evidence is prejudicial to one party or the other to some degree. *Marcee*, 2020 WL 4047970, at \*4. However, we need only determine whether any unfair prejudice existed which resulted in a decision being made on an improper basis. *Id.* From our review of the record, the text messages' probative value was not substantially outweighed by a danger of unfair prejudice. TEX. R. EVID. 403.

32

### c. Harmless Error

Even if the admission of the messages was erroneous, we do not otherwise find Bowden has shown the error had a substantial and injurious effect or influence on the jury's verdict. TEX. R. APP. P. 44.2(b). Any violation of evidentiary rules that results in an erroneous admission of evidence is not constitutional in nature. *Lam v. State*, 25 S.W.3d 233, 237-38 (Tex. App.—San Antonio 2000, no pet.); *Altamirano v. State*, No. 08-01-00235-CR, 2003 WL 1889947, at *6 (Tex. App.—El Paso Apr. 17, 2003, no pet.) (not designated for publication). A non-constitutional error that does not affect appellant's substantial rights must be disregarded. TEX. R. APP. P. 44.2(b). A substantial right is affected when an error has a substantial and injurious effect or influence in determining the jury's verdict. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). A substantial right is not affected when there is fair assurance that an error did not influence the jury or only had but a slight effect. *Id*. In making this determination, we review the following: the testimony and evidence admitted for the jury's consideration, the nature of evidence supporting the verdict, the character of the alleged error, and how it may be considered in connection with the other evidence of the case. *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000).

Bowden asserts the text messages only sought to show Bowden has a "voracious sexual appetite" and to portray him as a "sexual fiend." As mentioned above, we do not agree that such was the State's intent in admitting those messages. In addition to the messages, there was other evidence of record rebutting Bowden's theory of self-defense. For example, the jury heard his video-recorded interview in which he provided details of his encounter with the victim. Specifically, that when the victim asked him for money, he left the apartment, retrieved the chisel from where he had left it on the stairs, and returned to stab the victim. From our review of the

33

record in whole, we cannot say the admission of the text messages between Bowden and Chyna warranted a reversal of his conviction.

Bowden's third issue is overruled.

### III.  CONCLUSION

We affirm.

GINA M. PALAFOX, Justice

August 18, 2021

Before Rodriguez, C.J., Palafox, and Alley, JJ.

(Do Not Publish)